SENECA OIL COMPANY, Seneca Exploration Company, Harry H. Diamond, Inc., Par Oil Company, Eason Oil Company, Ladd Petroleum Company, Southland Royalty Company, Robert L. Adair, William S. Price as Trustee for Joel S. Price, Virginia K. Price Trust, Samuel F. Wilson, Jr., Bill J. Sparks and Lou Holtz, Plaintiffs-Appellees,

v.

DEPARTMENT OF ENERGY and Donald P. Hodel, Secretary of Energy, Defendants-Appellants.

No. 10–45.

Temporary Emergency Court of Appeals.

Argued Dec. 13, 1982.

Decided May 18, 1983.

As Corrected June 7, 1983.

Rehearing and Rehearing En Banc Denied July 1, 1983.

it could not be erased.

William J. Mutryn, Francis J. Lapallo, Barry S. Landsberg, Casson, Calligaro & Mutryn, Washington, D.C., were on briefs, for plaintiffs-appellees.

Larry Ellsworth, Mark Kreitman, Beth Mizuno, Office of the Gen. Counsel, U.S. Dept. of Energy, Washington, D.C., were on briefs, for defendants-appellants.

Before INGRAHAM, BECKER and BROWN, Judges.

WILLIAM H. BECKER, Judge.

This is an appeal by the Department of Energy (DOE) and the Secretary of Energy[1] from the summary judgment of the District Court which concluded that Ruling 1980–3 of the DOE, 45 Fed.Reg. 48577 (July 21, 1980), was "substantively invalid." Ruling 1980–3 was issued by the Office of General Counsel of the DOE as an interpretative ruling under 10 C.F.R. § 205.150 to "clarify the meanings" of the terms "property" and "produced" in the newly discovered crude oil ceiling price rule, 10 C.F.R. § 212.79 (1979).

The issue raised on this appeal is whether Ruling 1980–3 was invalid because the ruling concluded that the word "produced" in 10 C.F.R. § 212.79 (1979) did not mean "produced in commercial quantities." For the reasons which follow we conclude that Ruling 1980–3 was valid and reverse the judgment of the District Court.

We begin by discussing the regulatory background of Ruling 1980–3.

### THE JANUARY 8, 1979 PRELIMINARY PROPOSED NEWLY DISCOVERED CRUDE OIL CEILING PRICE RULE (LEGISLATIVE REGULATION)

In April 1977, the President submitted to Congress a National Energy Plan (NEP) which, among other things, proposed price incentives for certain categories of crude oil and natural gas to increase domestic production of petroleum products. To implement the NEP the Economic Regulatory Administration (ERA) of the DOE issued a Notice of Proposed Rulemaking and Public Hearing "for the purpose of determining whether to adopt additional price incentives for newly discovered crude oil." 44 Fed. Reg. 1888 (January 8, 1979). The notice proposed an "incentive system" which would establish a new category of crude oil entitled "newly discovered crude oil" that could be sold at market price levels without regard to the ceiling prices for crude oil then applicable under the pricing regulations of the DOE. 44 Fed.Reg. 1888.

To establish this incentive system the ERA proposed a legislative regulation, in the notice of January 8, 1979, entitled the "newly discovered crude oil ceiling price rule." 44 Fed.Reg. 1893. The terms "newly discovered crude oil" and "new reservoir" were defined in this proposed legislative regulation as follows (44 Fed.Reg. 1893):

> "Newly discovered crude oil" means domestic crude oil which has been certified by the state (or by the United States Geological Survey with respect to federal lands) in which the crude oil is: (A) produced from a new lease on the Outer Continental Shelf; or (B) produced (other than from the Outer Continental Shelf) from a new well the completion location of which is (i) 2.5 statute miles or more from the nearest old well; or (ii) located at a depth of at least 1,000 feet below the

1. Pursuant to Rule 43(c) of the Federal Rules of Appellate Procedure, Donald P. Hodel, Secretary of Energy, in his official capacity has been substituted for his predecessor James B. Edwards, former Secretary of Energy.

deepest completion location of each old well within 2.5 statute miles of such new well; or (C) produced (other than from the Outer Continental Shelf) from a *new reservoir.*

\* \* \* \* \* \*

"New reservoir" means any reservoir from which crude oil *was not produced in commercial quantities* before January 1, 1979. [Emphasis added.]

In a discussion of these two proposed definitions, the ERA made the following statements about its decision to include crude oil from a "new reservoir" in the proposed definition of newly discovered crude oil (44 Fed.Reg. 1889–1890):

> Included in the definition of "new natural gas" in the NGPA [Natural Gas Policy Act of 1978] is gas produced from a "new onshore reservoir". The rule proposed today similarly includes crude oil produced from a new onshore reservoir in the definition of newly discovered oil. *However, the new reservoir inclusion in both the NGPA and this proposal represents a significant departure from the NEP proposals of the President for both new natural gas and newly discovered crude oil.* The NEP proposed to provide incentive prices only for those crude oil and natural gas drilling activities that are directed toward new field exploration rather than development, and which are, therefore, likely to involve a high degree of risk, as well as the possibility of significant new finds. It is such exploratory activities that the incentive price as proposed in the NEP was intended to elicit and as to which we believe the incentive price is warranted.

> Therefore, we specifically request comments on whether the inclusion of crude oil produced from new reservoirs is consistent with this policy and will result in any significant increase in crude oil production.

\* \* \* \* \* \*

We also solicit comments on whether, if we do include new reservoir production in the definition of newly discovered crude oil, it would be more appropriate to define newly discovered crude oil as that crude oil produced from a new reservoir for which drilling was commenced after January 1, 1979, *rather than a reservoir from which crude oil was not produced in commercial quantities before January 1, 1979.* [Emphasis added.]

## THE NEWLY DISCOVERED CRUDE OIL CEILING PRICE RULE (LEGISLATIVE REGULATION) OF MAY 2, 1979

After receiving written comments and holding public hearings on the proposed legislative regulation, the ERA of the DOE adopted amendments, effective June 1, 1979, to the Mandatory Petroleum Price Regulations to provide a price incentive for newly discovered crude oil. 44 Fed.Reg. 25828 (May 2, 1979). Under these amendments, several sections of 10 C.F.R. Part 212 were revised and the following new section, 10 C.F.R. § 212.79 (1979), referred to hereinafter as the May 2, 1979 legislative regulation, was added (44 Fed.Reg. 25830–25832):

> § 212.79 Newly discovered crude oil ceiling price rule.

> (a) *Rule.* Notwithstanding the provisions of § 212.73(a), first sales of newly discovered crude oil on or after June 1, 1979 are not subject to the ceiling price limitations of this subpart.

> (b) *Definitions.* For purposes of this section—

> "New lease" means any lease entered into on or after January 1, 1979 of an area from which there was no production in calendar year 1978.

> "Newly discovered crude oil" means domestic crude oil which is: (1) Produced from a new lease on the Outer Continental Shelf; or (2) *produced (other than from the Outer Continental Shelf) from a property from which no crude oil was produced in calendar year 1978.*

> "Outer continental shelf" means Outer Continental Shelf as defined under section 2(a) of the Outer Continental Shelf

Lands Act (43 U.S.C. 1331(a)). [Emphasis added.]

The terms "new reservoir" and "produced in commercial quantities" (included in the proposed legislative regulation) were not defined or referred to in the adopted May 2, 1979 legislative regulation quoted above. Nevertheless, appellees contend on this appeal that the "commercial quantities" language was implicit in the adopted legislative regulation because, appellees contend, the DOE intended the word "produced" to mean "produced in commercial quantities."

The ERA discussed the May 2, 1979 legislative regulation at length in the preamble to that regulation. In the beginning paragraph of the preamble the ERA summarized the adopted regulation as follows (44 Fed.Reg. 25828):

Effective June 1, 1979, the Mandatory Petroleum Price Regulations are amended to provide additional price incentives for crude oil production. The amendments will permit crude oil which qualifies as newly discovered to be sold at market prices without regard to the specific dollar ceiling prices that are currently applicable under the price regulations. Newly discovered crude oil is defined as crude oil sold after May 31, 1979 which was produced from: (1) An area in the outer continental shelf for which the lease was entered into on or after January 1, 1979 and from which there was no production in calendar year 1978; or (2) an onshore property *from which no crude oil was produced in calendar year 1978.* [Emphasis added.]

In Part I of the preamble to the legislative regulation the ERA discussed the preliminary proposed definition of newly discovered crude oil as follows (44 Fed.Reg. 25828):

We proposed in the January Notice to define "newly discovered crude oil" as crude oil produced from: (1) An area in the outer continental shelf (OCS) for which there was no lease in effect on January 1, 1979 which was entered into prior to that date ("new lease" proposal); or (2) an onshore well on which surface drilling commenced on or after January

1, 1979 and which is at least 2.5 miles from an existing producing well or the completion depth of which is at least 1,000 feet below the deepest completion depth of any existing producing well within 2.5 miles of the new well ("new well" proposal); or (3) any well on an onshore reservoir if crude oil was not produced from such reservoir in commercial quantities prior to January 1, 1979 ("new reservoir" proposal).

\*    \*    \*    \*    \*    \*

*In proposing to make newly discovered status available to crude oil production from a new reservoir, we departed from the concept that incentives for newly discovered crude oil would be limited to exploratory drilling activity.* Accordingly, we requested comments as to whether such a departure would be consistent with the objectives of the NEP and would result in any significant increase in domestic crude oil production. [Emphasis added.]

In Part II of the same preamble the comments received by the DOE concerning the new reservoir proposal were summarized in part as follows (44 Fed.Reg. 25829):

With respect to the new reservoir proposal, most industry representatives suggested a revision to permit the sale at market prices of crude oil produced from any exploratory drilling, regardless of whether there was previous production in commercial quantities from the reservoir on which the drilling occurs. Several of the commenters seeking such an extension of the new reservoir concept indicated, however, that they believed that crude oil produced from a previously developed reservoir *should be eligible for sale as newly discovered crude oil only if there had been no production from the reservoir during the last six months of 1978.* [Emphasis added.]

In Part III of the same preamble the following additional statements were made while discussing the adopted definition of newly discovered crude oil (44 Fed.Reg. 25829):

We have decided to adopt an amendment similar to that which was proposed, which will provide that crude oil produced from an OCS [outer continental shelf] area for which the lease was entered into on or after January 1, 1979 (including property that was leased prior to that date but was abandoned and subsequently leased again on or after that date) and from which there was no production in 1978, may be sold at market prices on or after June 1, 1979. We have also decided to modify the proposal relating to onshore production in accordance with the comments we received. *Accordingly, crude oil produced from any onshore property from which there was no production in calendar year 1978 and sold on or after June 1, 1979 will qualify as newly discovered crude oil* and be eligible for sale at market prices without regard to specific dollar ceiling prices. Our decision to delete the depth and distance requirements and to rely exclusively on the property concept is based upon our determination that these criteria would cause substantial difficulties to both industry and State agencies. The property concept, on the other hand, has been an important feature of the crude oil price regulations since their inception. Consequently, it provides a crude oil producer with familiar criteria to apply in making a determination as to whether certain crude oil production qualifies for sale as newly discovered. Furthermore, use of the property concept will include as newly discovered crude oil all crude oil production that would have so qualified under the new reservoir proposal.

Our decision to also treat as newly discovered, crude oil produced from a property which has been previously developed *but from which there was no production in calendar year 1978* is based on our belief that the availability of this incentive will result in increased domestic production in furtherance of the objectives of the NEP. In addition, we believe that *limiting the incentive to properties from which there was no production in calendar year 1978* will prevent producers from abandoning production for the purpose of realizing benefits. This limitation is, however, sufficiently flexible to afford newly discovered status to crude oil produced as the result of the resumption of production on a property which was abandoned as uneconomic, as long as the abandonment occurred prior to January 1, 1978. [Emphasis added and footnote omitted.]

THE JUNE 23, 1980 PROPOSED RULE-MAKING TO AMEND THE NEWLY DISCOVERED CRUDE OIL CEILING PRICE RULE (LEGISLATIVE REGULATION) OF MAY 2, 1979

On June 16, 1980, the ERA issued another Notice of Proposed Rulemaking and Public Hearing (Second Notice). 45 Fed.Reg. 42222 (June 23, 1980). Among other things, the Second Notice of June 23, 1980 proposed amendments to the May 2, 1979 legislative regulation, 10 C.F.R. § 212.79 (1979). The notice provided in part (45 Fed.Reg. 42222–42223):

The proposed rules would add a definition of a "newly discovered crude oil property" to § 212.79(b). The definition "newly discovered crude oil" set forth in § 212.79(b), effective June 1, 1979, provides that crude oil produced from a property from which no crude oil was *produced* in calendar year 1978 qualifies to be sold at prices exempt from the ceiling price limitations of the DOE regulations. The proposed definition of "newly discovered crude oil property" would exempt a property's production from the ceiling price limitations if no crude oil was *produced and sold* from that property in calendar year 1978. This proposed definition would also include as a newly discovered crude oil property a unitized property for which a unit base production control level was established prior to January 1, 1978, and from which no crude oil was produced and sold in calendar year 1978.

An alternative proposed definition of "newly discovered crude oil property" would exempt a property's production

from the ceiling price limitations if no crude oil was *produced and sold in commercial quantities* from that property in calendar year 1978. Consideration should be given to this alternative each time that consideration is given to the primary proposed definition of "newly discovered crude oil property". Comments on this alternative should address the issue of what constitutes commercial quantities.[1]

[Footnote 1. The Conference Report on the Windfall Profit Tax Act of 1980 states that, for purposes of the windfall profit tax, newly discovered oil includes production from a property which did not produce oil in commercial quantities during calendar year 1980. The Report also indicates that commercial production does not include production which is incidental to the drilling of exploratory or test wells and which is not continuous. Comments on what constitutes commercial quantities should address the language in the Report and also the degree of need for uniformity in the definition of "newly discovered crude oil" for purposes of DOE's pricing regulations and for purposes of the windfall profit tax.]

The proposed alternative definitions were set forth in the Second Notice of June 23, 1980 in part as follows (45 Fed.Reg. 42229):

"Newly discovered crude oil": (1) means domestic crude oil which is produced from a newly discovered crude oil property;

\*     \*     \*     \*     \*     \*

"Newly discovered crude oil property" means: (1) a new lease on the Outer Continental Shelf; or (2) a property (not on the Outer Continental Shelf) or a unitized property (for which a unit base production control level was established prior to January 1, 1978) from which no crude oil was produced and sold [in commercial quantities] in calendar year 1978. [Brackets, and words within, in original.]

## THE JULY 21, 1980 INTERPRETATIVE RULING 1980–3

On July 14, 1980, the Office of General Counsel of the DOE issued interpretative Ruling 1980–3, without public notice and opportunity for comment. 45 Fed.Reg. 48577 (July 21, 1980). Part I of the ruling discussed the meaning of the term "property" in the May 2, 1979 legislative regula-

tion, 10 C.F.R. § 212.79(b) (1979). Part II of the ruling discussed the meaning of the term "produced" in the May 2, 1979 legislative regulation. Part II provided in relevant part (45 Fed.Reg. 48578–48579):

## II. Meaning of the Term "Produced"

The DOE has also received many inquiries concerning what constitutes a property from which no crude oil was *produced* in calendar year 1978 for purposes of qualifying crude oil production as newly discovered crude oil pursuant to § 212.79. The criterion established by § 212.79(b) is not whether crude oil was produced and sold, produced in commercial quantities [3] or produced pursuant to state production allowables from the property during calendar year 1978. These additional factors were not incorporated into 10 CFR 212.79 and are not relevant to the determination of whether crude oil production from the property may be certified as newly discovered crude oil. The fact that crude oil was produced from a property prior to calendar year 1978 also is not relevant to a determination of whether that property's crude oil production after June 1, 1979, may receive incentive prices where that property had no crude oil production in calendar year 1978.[4]

[Footnote 3. The proposed regulations for newly discovered crude oil would have permitted crude oil production from a "new reservoir" from which crude oil was *not produced* in *commercial quantities* prior to January 1, 1979, to qualify for incentive prices without reference to the drilling and distance requirements proposed for other crude oil production. 44 FR at 1889. However, the DOE decided not to adopt the drilling requirements and the corresponding "commercial quantities" language in the final rule on newly discovered crude oil.

A number of producers have filed requests for interpretations with the DOE, contending that the language of the Conference Report to the Crude Oil Windfall Profit Tax Act of 1980, Pub.L.No. 96–223 (April 2, 1980), retroactively amends the DOE's definition of "newly discovered crude oil" in 10 CFR 212.79. While the Windfall Profit Tax Act purports to adopt the meaning of "newly discovered oil" that was "given to such term by the June 1979 energy regulations," the Conference Report notes that for purposes of the windfall profit tax, "newly discovered oil" may be produced and sold from

"a property which did not produce oil in commercial quantities," where "production was incident to the drilling of exploratory or test wells and was not part of continuous or commercial production from the property during 1978." Whatever the effect of this language on the meaning of "newly discovered oil" for windfall profit tax purposes, it cannot retroactively change the meaning of the term "newly discovered crude oil" for DOE pricing purposes under § 212.79.

Footnote 4. On June 16, 1980, we issued a Notice of Proposed Rulemaking that proposed amendments to the definition of newly discovered crude oil." 45 FR 42222 (June 23, 1980).]

## THE NOVEMBER 25, 1980 AMENDMENTS TO THE NEWLY DISCOVERED CRUDE OIL CEILING PRICE RULE (LEGISLATIVE REGULATION)

After Ruling 1980–3 was issued, the ERA adopted a legislative regulation which, among other things, amended the May 2, 1979 legislative regulation. 45 Fed.Reg. 78588 (November 25, 1980). The amendments to the May 2, 1979 legislative regulation were adopted after public notice and opportunity for comment on the amendments proposed in the Second Notice of June 23, 1980. Included in the amended definition of newly discovered crude oil was oil produced from a property "from which no crude oil was produced and sold in commercial quantities in calendar year 1978." 45 Fed.Reg. 78594. The phrase "in commercial quantities" was included in the amended definition for reasons set forth in the preamble to the amendments of November 25, 1980 as follows (45 Fed.Reg. 78590):

We are adding a definition of a "newly discovered crude oil property" to § 212.-79(b) and revising the definition of "newly discovered crude oil" in § 212.79(b) to be based on this new definition. The effect of the definition of "newly discovered crude oil property" will be to exempt a property's production from the ceiling price limitations if no crude oil was "produced and sold in commercial quantities" from that property in calendar year 1978. The overwhelming majority of the comments concerning the definition of "newly discovered crude oil property" favored inclusion of the term "in commercial quantities." We agree that the term

should be included in the definition. Its inclusion should result in a similar meaning for newly discovered crude oil under our regulation and under whatever regulations that the IRS ultimately adopts for purposes of the Windfall Profit Tax. Such similarity will lessen the burden on producers and purchasers of complying with our regulations and those of the IRS.

The November 25, 1980 amendments to the May 2, 1979 legislative regulation were effective January 1, 1981, but were not effective retroactively. 45 Fed.Reg. 78590. In the preamble to the amendments, the ERA stated that under the then existing May 2, 1979 legislative regulation, 10 C.F.R. § 212.79 (1979), the test for newly discovered crude oil was "whether there was *no production* in calendar year 1978." 45 Fed. Reg. 78588. And the ERA incorporated Ruling 1980–3 by reference stating that the meaning of "production" under the then existing May 2, 1979 legislative regulation was discussed in Ruling 1980–3. 45 Fed. Reg. 78588 footnote 2.

## THE PROCEEDINGS IN THE DISTRICT COURT

On February 23, 1981, appellees filed a Complaint in the District Court seeking declaratory and injunctive relief against the enforcement of Ruling 1980–3. [Record on Appeal (R.), 002–012.]

In a section of the Complaint entitled "Factual Background" appellees alleged that Seneca Oil Company (Seneca) is an independent producer of crude oil and natural gas operating primarily in Oklahoma; that in 1977 and 1978 Seneca commenced drilling on five properties in Oklahoma; that in 1978 and 1979 "flow test procedures" were undertaken to determine if the five wells had sufficient productive capability to be economically viable; that upon completion of the testing and until November 15 and 16, 1979, the five wells were not producing oil; that during the flow tests a "volume of natural gas condensate" was recovered and sold as "test oil" to

eliminate the cost of storing the oil; that because only test oil was recovered from the five wells in 1978, and because under "general industry understanding"[2] the word "produced" in the May 2, 1979 legislative regulation, 10 C.F.R. § 212.79(b) (1979), meant "produced in commercial quantities," Seneca interpreted 10 C.F.R. § 212.79(b) (1979) to include, as newly discovered crude oil, the crude oil produced after 1978 from the five wells; that Seneca therefore certified the crude oil, produced from the five properties after the commencement of commercial production in November 1979, as newly discovered crude oil and received market prices for the oil; that because the definition of newly discovered crude oil was imprecise, Seneca deposited revenues received from the sale of the crude oil reflecting the excess of market price over the regulated price in an interest bearing "suspense account" pending clarification of the May 2, 1979 legislative regulation; that on December 21, 1979, Seneca filed a request for interpretation of the May 2, 1979 legislative regulation with the Office of General Counsel of the DOE; and that on July 18, 1980, this request for interpretation was dismissed upon the issuance of Ruling 1980–3. (R. 008–009.)

In Count I of the Complaint appellees alleged that the interpretation of newly discovered crude oil in Ruling 1980–3 was "arbitrary, capricious, an abuse of discretion, not in accordance with law, and unsupported by substantial evidence" for reasons set forth by appellees in Count I. (R. 010–011.) In Count II of the Complaint appellees alleged that Ruling 1980–3 was illegal and void because it established a "substantive rule" without public notice and opportunity for comment. (R. 011.)

After the Complaint was filed, appellants filed Defendants' Motion for Summary Judgment (R. 013), and appellees filed Plaintiffs' Cross-Motion for Summary Judgment (R. 146). Numerous memoranda in support of, and opposition to, these motions

2. We note that it is the understanding of the DOE (and its predecessors) rather than that of the industry that governs. *Standard Oil Com-*

were filed; oral arguments were heard; and on May 19, 1982, the District Court entered a Memorandum Opinion and Order (R. 695–708) which denied the motion of appellants for summary judgment, and granted the motion of appellees for summary judgment.

## THE DECISION OF THE DISTRICT COURT

In the Memorandum Opinion and Order of May 19, 1982, the District Court recognized that an interpretation by an agency of its regulations is entitled to judicial deference unless that interpretation is plainly erroneous or inconsistent with the regulations. (R. 699–702.) The Court concluded, however, that the "preamble to the May 2 Final Rule [legislative regulation], the agency's own interpretation of the rule in the regulatory analysis, the considerable effect defendants' construction of the term produced would have with respect to the windfall profits tax and on domestic production, compel the conclusion that Ruling 1980–3 is plainly inconsistent with the regulation and thus substantively invalid." (R. 707.)

The District Court stated that its decision was "premised" on an analysis of the May 2, 1979 legislative regulation which, under the principles of regulatory construction, must commence with an interpretation of the word "produced" according to its commonly understood meaning, there being no specific regulatory definition of the term; and that the definition of the DOE in the challenged Ruling 1980–3 might be upheld as a reasonable choice of several possible interpretations of the term and rule if the definition did not conflict with "explicit language in the regulation's preamble and the agency's own contemporaneous construction of the regulation." (R. 702–703.)

In reaching its conclusion the District Court relied primarily upon the preamble to the May 2, 1979 legislative regulation. The District Court stated (R. 703–705):

*pany v. Department of Energy,* 596 F.2d 1029 at 1067 (Em.App.1978).

It is well established that the preamble to a regulation of DOE should be considered in construing and determining the meaning of the regulation.

\* \* \* \* \* \*

[The preamble to the May 2, 1979 legislative regulation] clearly stated that all crude oil production that would have qualified as newly discovered crude oil under the new reservoir proposal would be entitled to newly discovered crude oil status under the property concept. The new reservoir proposal was not merely referred to, but was specifically defined earlier in the preamble as "any well on an onshore reservoir if crude oil was not produced from such reservoir in commercial quantities prior to January 1, 1979." DOE attempts to avoid this unequivocal statement by contending that the commercial quantities language and the new reservoir principle incorporating the concept of production in commercial quantities were omitted from the May 2 Final Rule. This conclusion simply is not supported by the preamble. In explaining the changes made with respect to onshore production (section (2) new well proposal and section (3) new reservoir proposal of the proposed definition), the ERA essentially states that the depth and distance requirements of the section (2) new well proposal, had been eliminated but that the section (3) new reservoir proposal had not been deleted but rather was included within the final rule. The specific words "commercial quantities" do not appear in the regulation, yet, the preamble incorporates the commercial quantities criterion into the definition of newly discovered crude oil.

The District Court found additional support for its conclusion in a regulatory analysis of the May 2, 1979 regulation. The District Court stated (R. 706):

Additional support for the conclusion that Ruling 1980–3 incorrectly defines the term "produced" is found in the Regulatory Analysis of the May 2 Final Rule, that was prepared by the DOE Economic Regulatory Administration at the time the regulation was adopted to establish the economic impact of the rule. The analysis states at page 13 that:

The Final Rule provides market level pricing not only for newly *discovered* crude oil, but for properties which first become productive after December 31, 1978. This includes extension drilling on new properties resulting from pre-1979 successful exploration, new properties developed to exploit formations known to be productive but not developed prior to January 1, 1979, and *new production from reservoirs drilled but not put on production prior to January 1, 1979.* (emphasis added)

Though "on production" is not specifically defined, the context clearly indicates that it refers to commercial production. [Footnote omitted.]

Further, the effect of Ruling 1980–3 upon the windfall profits tax was discussed by the District Court as follows (R. 700–702):

Similarly, Congressional understanding of the term is not determinative in this case. It should not, however, as defendants urge, be totally ignored because of the inter-relationship of the regulation and the Crude Oil Windfall Profit Tax Act. Congress provided in that Act that newly discovered oil would be taxed at the lowest rate and would have "the meaning given to such term by the June 1979 energy regulations." (The May 2 Final Rule is part of these energy regulations). The Conference Report that preceded final passage of the Act states "For windfall profit tax purposes, therefore, newly discovered oil includes production from a property which did not produce oil in commercial quantities during calendar year 1978. Thus, it includes production from a property on which oil was produced in 1978 if that production was incident to the drilling of exploratory or test wells and was not part of continuous or commercial production from the property during 1978.

DOE did recognize that Congress' interpretation of "produced" merited some consideration when it solicited comments

in the June 23, 1981 Notice (of the proposed amendments to the May 2 Final Rule) on the need for uniformity in the definition of newly discovered crude oil for purposes of the windfall profit tax and DOE's pricing regulations. A contrary position was taken, though, by DOE's Office of General Counsel, who appears to have completely disregarded the rather significant effect that its ruling would have on the windfall profit tax revenues. Footnote 3 to Ruling 1980–3 simply dismisses the potential conflict by "Whatever the effect of this language (referral to the previously cited conference report statement) on the meaning of 'newly discovered oil' for windfall profit tax purposes, it cannot retroactively change the meaning of the term 'newly discovered crude oil' for DOE pricing purposes under § 212.79." Under Ruling 1980–3 a considerable amount of oil that Congress believed would be sold at upper tier prices would still be subject to price controls, but taxed at the lowest rate as "newly discovered crude oil." Thus the windfall profit and tax revenues would be diminished considerably. The court's decision is not, however, based on this effect. [Footnotes omitted.]

Relying on the effect of Ruling 1980–3 upon domestic production, the District Court further stated (R. 706):

> Including within the definition of newly discovered crude oil production from reservoirs drilled but not put on production in 1978 might, as defendants argue, result in a windfall for certain producers. Excluding such production, which Ruling 1980–3 dictates, could, however, have the effect of discouraging domestic production, contrary to the objectives of the NEP. This is because wells that were completed and tested in 1978 and found to be uneconomical would nevertheless, because of "measurable amounts" of crude oil resulting from the testing procedures, be denied the pricing incentive required to stimulate their production. [Footnote omitted.]

For the above reasons, the District Court granted the motion of appellees for summary judgment. The record on appeal does not clearly show, however, if all or part of Ruling 1980–3 was considered invalid by the District Court. But we conclude on appeal that all of Ruling 1980–3 was valid.

## THE CONTENTIONS ON APPEAL

On appeal appellants contend that Ruling 1980–3 was valid and state their contentions as follows:

(A) Ruling 1980–3 is consistent with the language and purpose of the underlying regulation, is entitled to judicial deference and should be upheld;

(B) The plain meaning of the regulation should control; and

(C) The District Court's reliance on contemporaneous construction was error, because

(1) The preamble to the May 2 Final Rule did not incorporate the commercial quantities criterion,

(2) The District Court's reliance on the regulatory analysis was misplaced, and

(3) The Windfall Profits Tax Act does not reinterpret DOE's regulation to conflict with its plain meaning.

In opposition appellees contend that the conclusions of the District Court were correct and state their contentions in part as follows:

(A) The District Court properly ascertained ERA's intent by examining the preamble to the May 2, 1979 Final Rule;

(B) The District Court properly considered congressional understanding of the May 2 Final Rule to incorporate the commercial quantities criterion; and

(C) Ruling 1980–3 is plainly inconsistent with both the May 2 Final Rule and Congress' stated understanding of the May 2 Final Rule, and the ruling therefore is not entitled to judicial deference.

## I.

### PRELIMINARY MATTERS

#### Exhaustion of Administrative Remedies, Ripeness and Standing

There is no contention by appellants that the judgment of the District Court should be reversed because appellees failed to exhaust administrative remedies before seeking injunctive and declaratory relief in the District Court. See *Hawthorne Oil & Gas Corporation v. Department of Energy,* 647 F.2d 1107 (Em.App.1981); *Missouri Terminal Oil Company v. Edwards,* 659 F.2d 139 (Em.App.1981); 5 Mezines, Stein, Gruff, *Administrative Law,* Chapter 49; and authorities cited therein. Nor is there any contention by appellants that the controversy is not ripe for adjudication, or that appellees did not have standing to seek the relief requested in their Complaint. See 5 Mezines, Stein, Gruff, *Administrative Law,* Chapter 48 (on ripeness and finality), and Chapter 50 (on standing).

Because the judgment of the District Court will be reversed on the merits, the foregoing procedural issues concerning the right of appellees to seek relief on the merits will not be adjudicated on the initiative of this Court, though they might be. But the decision on the merits of this appeal should not be construed as a holding in favor of appellees on any of the procedural issues described above.

#### The Terms "Regulation," "Rule" and "Ruling" as Used in This Opinion

Because of the general usage of the terms "rule" and "ruling" interchangeably as synonyms, the term "ruling" as in "interpretative ruling" is used in this opinion in preference to "rule" as in "interpretative rule."

And because of the general usage of the terms "rule" and "regulation" interchangeably as synonyms, the term "regulation" as in "legislative regulation" is used in this opinion in preference to "rule" as in "legislative rule."

#### The Standards of Review

We begin our analysis by discussing the statutory standards of review invoked by appellants in Count I of their Complaint (R. 010–011).

Section 5(a)(1) of the Emergency Petroleum Allocation Act (EPAA), 15 U.S.C. § 754(a)(1), incorporates by reference the judicial review provisions set forth in Section 211(d) of the Economic Stabilization Act (ESA), 12 U.S.C. § 1904 note. Section 211(d) of the ESA provides, among other things, that a regulation shall not be enjoined or set aside, in whole or in part, "unless a final judgment determines that the issuance of such regulation was in excess of the agency's authority, was arbitrary or capricious, or was otherwise unlawful under the criteria" set forth in the Administrative Procedure Act (APA) 5 U.S.C. § 706(2). The APA, 5 U.S.C. § 706(2), provides:

The reviewing court shall—

\* \* \* \* \* \*

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

These statutory criteria govern the standards of judicial review in an action to enjoin or set aside actions, findings and conclusions of the DOE arising under the EPAA. See for examples *McCulloch Gas*

*Processing Corporation v. Department of Energy,* 650 F.2d 1216 at 1220 (Em.App. 1981), *Mobil Oil Corporation v. Department of Energy,* 610 F.2d 796 at 800–801 (Em. App.1979), *cert. denied,* 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980), and cases therein cited.

The appellate courts, including this Court, have also recognized a distinction between a legislative regulation and an interpretative ruling for the purpose of determining whether the action of the administrative agency is binding on the courts. This Court, for example, has stated that an interpretative ruling is not binding on the courts, whereas a legislative regulation has the force of law. *Pennzoil Company v. Department of Energy,* 680 F.2d 156 at 169 (Em.App.1982); *Energy Consumers and Producers Association, Inc. v. Department of Energy,* 632 F.2d 129 at 140 (Em.App. 1980), *cert. denied,* 449 U.S. 832, 101 S.Ct. 102, 66 L.Ed.2d 38 (1980); *Energy Reserves Group, Inc. v. Department of Energy,* 589 F.2d 1082 at 1093 (Em.App.1978).

■ Further, there are standards of deference to be accorded by the courts to interpretations of statutes and regulations by administrative agencies. These standards of deference are enunciated in *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), *rehearing denied,* 380 U.S. 989, 85 S.Ct. 1325, 14 L.Ed.2d 283 (1965) involving statutory interpretation, and in *Bowles v. Seminole Rock & Sand Company,* 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945), involving administrative interpretation of a legislative regulation. Under these standards, an interpretation by an administrative agency of a legislative regulation of that agency is not binding upon the courts, but a reviewing court, in the absence of exceptional circumstances, must defer to the administrative interpretation. *Udall v. Tallman, supra,* 380 U.S. 1 at 16–17, 85 S.Ct. 792 at 801, 13 L.Ed.2d 616 at 625–626 (1965); *Bowles v. Seminole Rock & Sand Company, supra,* 325 U.S. 410 at 413–414, 65 S.Ct. 1215, at 1217, 89 L.Ed. 1700 at 1702 (1945); *Pennzoil Company v. Department*

*of Energy,* 680 F.2d 156 at 169–170 (Em. App.1982); and cases therein cited.

*Preliminary Decision that Ruling 1980–3 is an Interpretative Ruling*

■ Although in Count II of their Complaint (R. 011) appellants alleged that Ruling 1980–3 was a "substantive rule" issued without the required notice and comment procedure of the APA, 5 U.S.C. § 553, the District Court did not reach the merits of this allegation (R. 707). Before proceeding to review the contentions on appeal, we deem it necessary and desirable to decide whether Ruling 1980–3 was a legislative regulation requiring prior notice and comment under the APA, 5 U.S.C. § 553, because no notice and comment was given or received by DOE before issuance of Ruling 1980–3.

For the reasons described at length in *Energy Reserves Group, Inc. v. Department of Energy,* 589 F.2d 1082 (Em.App.1978), and *Energy Consumers and Producers Association, Inc. v. Department of Energy,* 632 F.2d 129 (Em.App.1980), *cert. denied,* 449 U.S. 832, 101 S.Ct. 102, 66 L.Ed.2d 38 (1980), we hold that Ruling 1980–3 was an interpretative ruling, which did not require notice and comment prior to its issuance. Further, as an interpretative ruling, it was not binding on the courts, but was entitled to deference in the absence of exceptional circumstances. *Bowles v. Seminole Rock & Sand Company, supra,* 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945).

II.

RULINGS ON CONTENTIONS ON APPEAL

Appellants, the DOE and the Secretary of Energy, primarily contend that "Ruling 1980–3 is consistent with the language and purpose of the underlying regulation [adopted May 2, 1979], is entitled to judicial deference and should be upheld." In opposition appellees primarily contend that Ruling 1980–3 is plainly inconsistent with the May 2, 1979 legislative regulation, when the May 2, 1979 legislative regulation is con-

strued by examining the preamble thereto, and when the subsequent Windfall Profits Tax on Domestic Crude Oil Act of 1980 (Windfall Profits Act), 26 U.S.C. §§ 4986 *et seq.,* and the legislative history thereof is considered.

We sustain the contentions of the appellants and reverse the judgment of the District Court for the following reasons.

### The Preamble Considered With the Regulation

■ The legal contentions, advocated by parties to litigation in this Court, concerning the effect of the language of preambles to legislative regulations go from one extreme to the other. At one extreme, it was erroneously contended by the regulated parties that the law requires that the preamble be totally excluded from consideration. See *Wiggins Brothers, Inc. v. Department of Energy,* 667 F.2d 77 at 88 (Em.App.1981), *cert. denied,* 456 U.S. 905, 102 S.Ct. 1749, 72 L.Ed.2d 161 (1982). At the other extreme, in this case it is contended by the regulated parties that some minor ambiguity in the language of a preamble to the legislative regulation be given importance predominating over the language of the legislative regulation and the official interpretation thereof. Curiously, in this case the DOE and the Secretary of Energy contend that the preamble should not be considered because the "plain meaning" of the legislative regulation should control.

We conclude that the preamble to the May 2, 1979 legislative regulation should be considered, and that deference should be given to interpretative Ruling 1980–3 as a reasonable interpretation of the May 2, 1979 legislative regulation, resolving the

minor ambiguity arising from a minor imprecision in drafting the language of the preamble.

The May 2, 1979 legislative regulation stated in part that newly discovered crude oil was domestic crude oil "produced (other than from the Outer Continental Shelf) from a property from which *no crude oil was produced* in calendar year 1978." (Emphasis added.) Interpretative Ruling 1980–3 stated, among other things, that the word "produced" in the May 2, 1979 legislative regulation did not mean "produced in commercial quantities." This interpretation is clearly consistent with the May 2, 1979 legislative regulation, when the legislative regulation is considered without the preamble to that regulation.

Consequently, the primary issue on this appeal is whether Ruling 1980–3 was invalid because of some minor imprecise language in the preamble to the May 2, 1979 legislative regulation. This issue arises because appellees contend that the May 2, 1979 legislative regulation, when considered with the preamble thereto, is contrary to interpretative Ruling 1980–3, and that Ruling 1980–3 is therefore invalid and not entitled to judicial deference.

The rule that a preamble should be considered in construing a legislative regulation is followed by this Court. *Wiggins Brothers, Inc. v. Department of Energy,* 667 F.2d 77 at 88 (Em.App.1981), *cert. denied,* 456 U.S. 905, 102 S.Ct. 1749, 72 L.Ed.2d 161 (1982); *UPG, Inc. v. Edwards,* 647 F.2d 147 at 152 (Em.App.1981). And the rule is fully applicable in this case.[3]

We conclude, however, that under the circumstances in this case the analysis of

---

**3.** Appellants contend that "extrinsic" or "secondary" aids to interpretation, such as the preamble, should not be considered when the regulation in question is clear and unambiguous; that the May 2, 1979 legislative regulation is clear and unambiguous; and that the District Court therefore erred in considering the preamble. This "plain meaning rule" was recently rejected by this Court in *Wiggins Brothers, Inc. v. Department of Energy, supra,* 667 F.2d 77 (Em.App.1981) *cert. denied,* 456 U.S. 905, 102 S.Ct. 1749, 72 L.Ed.2d 161 (1982), and by the

Supreme Court in *Watt v. Alaska,* 451 U.S. 259 at 266–267, 101 S.Ct. 1673 at 1678, 68 L.Ed.2d 80 at 88 (1981). Although the *Watt* case, *supra,* concerned statutory construction, the broad limitations on the "plain meaning rule" enunciated in that case are applicable in this case. So consideration of the preamble in this case was not error. *Cf. Wiggins Brothers, Inc. v. Department of Energy,* 667 F.2d 77 at 88 (Em.App.1981), *cert. denied,* 456 U.S. 905, 102 S.Ct. 1749, 72 L.Ed.2d 161 (1982).

the May 2, 1979 legislative regulation by appellees gives undue predominance and effect to minor disconnected and imprecise language of the preamble, selected out of context. The first selected language was in Part I of the preamble as follows (44 Fed. Reg. 25828):

> We proposed in the January Notice to define "newly discovered crude oil" as crude oil produced from: ... (3) any well on an onshore reservoir if crude oil was not produced from such reservoir in commercial quantities prior to January 1, 1979 ("new reservoir" proposal).

The second selected language was in Part III of the preamble as follows (44 Fed.Reg. 25829):

> Furthermore, use of the property concept will include as newly discovered crude oil all crude oil production that would have so qualified under the new reservoir proposal.

The reliance by appellees on these two minor disconnected selected statements of the lengthy preamble, as predominating in interpretation of the May 2, 1979 legislative regulation, ignores the administrative history of the legislative regulation, the language of the legislative regulation, and the remaining most of the text of the preamble supporting the contrary conclusion enunciated in interpretative Ruling 1980–3.

■ Although the preliminary proposed definition of newly discovered crude oil, in the notice of January 8, 1979, included the "commercial quantities" language of the new reservoir proposal, the ERA then repeatedly expressed reservations and requested comments, in the notice of January 8, 1979, about adopting the new reservoir proposal and using the "commercial quantities" language. 44 Fed.Reg. 1889–1890. Thereafter, when the May 2, 1979 legislative regulation was adopted, the "commercial quantities" language was deliberately omitted by the ERA from the definition of newly discovered crude oil. Appellees contend, however, that the "commercial quantities" concept was retained by the ERA in the adopted May 2, 1979 legislative regulation, because, appellees argue, the ERA intended the phrase "no crude oil was produced" in the legislative regulation to mean "no crude oil was produced in commercial quantities."

In addition to the clear language in the May 2, 1979 legislative regulation, repeated language in the preamble supports the contrary conclusion expressed in interpretative Ruling 1980–3 that the test for newly discovered crude oil was "no production." For example, the ERA stated in the preamble that "crude oil produced from any onshore property from which there was *no production* in calendar year 1978 ... will qualify as newly discovered crude oil." (Emphasis added and footnote omitted.) 44 Fed.Reg. 25829.

There are no clear statements in the preamble clearly contradicting these repeated statements, therein, that newly discovered crude oil was limited to crude oil from properties from which there was *no production* in 1978.

The language in the preamble, relied on by appellees as incorporating in the definition of newly discovered crude oil "all crude oil production that would have so qualified under the new reservoir proposal," appears to be a minor inadvertent clerical error of imprecise unclear draftsmanship insufficient to contradict the repeated clear statements in the preamble and the May 2, 1979 legislative regulation itself, all of which support the interpretation in Ruling 1980–3. It is the purpose of valid interpretative rulings, such as Ruling 1980–3, to resolve the minor questions raised by contentions such as those advanced by appellees. Further, the entire industry has been guided by valid interpretative rulings, such as Ruling 1980–3.

Ruling 1980–3 was plainly consistent with the May 2, 1979 legislative regulation. The ruling reasonably resolved the minor questions raised by appellees concerning the effect of the preamble upon the May 2, 1979 legislative regulation. As an administrative interpretation of a regulation of the DOE, Ruling 1980–3 is entitled to deference and is upheld.

*Administrative History of the November 25, 1980 Amended Legislative Regulation*

Before interpretative Ruling 1980–3 was issued, the ERA issued the Second Notice of June 23, 1980 which, among other things, proposed to amend the definition of newly discovered crude oil in the May 2, 1979 legislative regulation. The ERA proposed, and requested comments on, two amended alternative definitions, which are quoted in part above.

The Second Notice of June 23, 1980 supports our conclusion that interpretative Ruling 1980–3 was a legally correct and reasonable interpretation of the May 2, 1979 legislative regulation for the following reasons. First, in the Second Notice of June 23, 1980 the ERA stated that under the May 2, 1979 legislative regulation newly discovered crude oil was crude oil produced from a property from which *no crude oil was produced in calendar year 1978.* 45 Fed.Reg. 42222–42223. Second, if the "commercial quantities" language was implicit in the May 2, 1979 legislative regulation, the later amendment to add the "commercial quantities" language was unnecessary. Third, the Second Notice of June 23, 1980 proposed and requested comments on two alternative definitions only one of which proposed to add the "commercial quantities" language.

The Second Notice of June 23, 1980 was issued before Ruling 1980–3 was issued, and was cited in footnote 4 of Ruling 1980–3. Considering the Second Notice of June 23, 1980, the May 2, 1979 legislative regulation, and the preamble to the May 2, 1979 legislative regulation, we find that the subsequent Ruling 1980–3 reasonably concluded that the ERA did not intend the word "produced" in the May 2, 1979 regulation to mean "produced in commercial quantities."

After Ruling 1980–3 was issued, the May 2, 1979 legislative regulation was amended by the ERA. 45 Fed.Reg. 78588 (November 25, 1980). The preamble to the amended legislative regulation of November 25, 1980 further supports our conclusion in this case for the following reasons. First, in the preamble the ERA stated that the addition of the "commercial quantities" language in the amended legislative regulation would "*expand* the scope of the newly discovered crude oil rule [legislative regulation] to include some properties that produced and sold crude oil in calendar year 1978." (Emphasis added.) 45 Fed.Reg. 78588. Second, the preamble favorably incorporated Ruling 1980–3 by reference stating the following (45 Fed.Reg. 78588):

> The test for newly discovered crude oil status under the existing rule [the May 2, 1979 legislative regulation] is whether there was *no production* in calendar year 1978 from the applicable property.[2]

[Footnote 2. Ruling 1980–3 (45 FR 48577, July 21, 1980) discusses the meaning of production with respect to the existing newly discovered crude oil rule.]

The appellees recognize this reference by the ERA to Ruling 1980–3, but quoting the District Court (at R. 707) contend that it is "equally plausible that rather than 'amending' the May 2 Final Rule [legislative regulation], DOE thought the Office of General Counsel had misinterpreted the regulation in Ruling 1980–3 and wanted to make the original intent clear." This contention of appellees is without merit. The proposed amendments to the May 2, 1979 legislative regulation were issued in the Second Notice of June 23, 1980 before interpretative Ruling 1980–3 was issued, and could not have been proposed to correct the alleged misinterpretation in Ruling 1980–3. The preamble to the amended legislative regulation of November 25, 1980 referred favorably to Ruling 1980–3. We do not believe that the amended legislative regulation of November 25, 1980 was issued to correct the alleged misinterpretation in Ruling 1980–3, rather than for the reasons clearly expressed by the ERA in the Second Notice of June 23, 1980 and in the preamble to the amended legislative regulation of November 25, 1980. The amendment of the May 2, 1979 regulation "was not an admission that the original definition and its interpretation were wrong or vague." *Department of Energy v. Louisiana,* 690 F.2d 180 at 189 (Em.

App.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983).

### The "Plain Meaning" of the Legislative Regulation of May 2, 1979 Is Not the Sole Criterion

In accordance with the foregoing conclusion that the preamble should be considered, the contention of the appellants, that the plain meaning of the May 2, 1979 legislative regulation is decisive, is rejected. Nevertheless, deference is accorded to interpretative Ruling 1980–3, as a reasonable interpretation of the legislative regulation consistent with the legislative regulation it interpreted. This leaves for consideration the remaining contentions of appellees.

### The Effect of the Regulatory Analysis

Appellees contend that an isolated paragraph from a regulatory analysis entitled "Regulatory Analysis of Final Rule: Incentive Prices for Newly Discovered Crude Oil" (R. 506–532) supports their contention that interpretative Ruling 1980–3 was invalid. This regulatory analysis was prepared by the Office of Regulations and Emergency Planning of the ERA of the DOE "to establish the economic impact" of the May 2, 1979 legislative regulation.

The isolated paragraph of the regulatory analysis does not support the contention of appellees because: (1) the paragraph makes no express reference to production in commercial quantities; (2) when read as a whole, the paragraph is consistent with interpretative Ruling 1980–3; and (3) the regulatory analysis is a lengthy unreliable inferior source including material references to proposed provisions rejected by the ERA when the May 2, 1979 legislative regulation was adopted (R. 516–517 and footnote 3). This selected isolated paragraph of an unreliable inferior source cannot be treated as controlling the language of the May 2, 1979 legislative regulation, as officially and reasonably interpreted in interpretative Ruling 1980–3.

### The Effect of the Windfall Profits Act of April 2, 1980, and the Legislative History Thereof

Appellees make two related contentions concerning the effect of the Windfall Profits Act of April 2, 1980, 26 U.S.C. §§ 4986 *et seq.,* and the legislative history thereof, on the validity of Ruling 1980–3.

Appellees first contend that in a Joint Explanatory Statement of the Committee of the Conference (Conference Statement) on the Windfall Profits Act, issued March 7, 1980, Congress stated its "understanding" that the definition of newly discovered crude oil in the previously adopted May 2, 1979 legislative regulation included the "commercial quantities" concept. Appellees argue that this "understanding" of the Conference Committee supports their contention that the interpretation in Ruling 1980–3 was incorrect.

Second, appellees contend that when Ruling 1980–3 was issued by the Office of General Counsel (OGC) of the DOE, the OGC disregarded the effect Ruling 1980–3 would have upon the windfall profit tax revenues; and that Ruling 1980–3 frustrated the congressional intent with respect to such revenues.

We conclude that these contentions of appellees are without merit for the following reasons.

■ The Windfall Profits Act of April 2, 1980 was passed by Congress after the adoption by the ERA of the May 2, 1979 legislative regulation, and did not amend or revoke that regulation. On the contrary, the Windfall Profits Act incorporated the previously effective regulations of the DOE, including the May 2, 1979 legislative regulation, by reference. The Windfall Profits Act, 26 U.S.C. § 4991(e)(2), defined newly discovered oil as follows:

(e) Tier 3 oil.—For the purposes of this chapter-

＊    ＊    ＊    ＊    ＊    ＊

(2) Newly discovered oil.—The term "newly discovered oil" has the meaning given to such term *by the June*

*1979 energy regulations.* [Emphasis added.]

In 26 U.S.C. § 4996(b)(8)(C), the "June 1979 energy regulations" were defined as including the terms of the energy regulations "as such terms existed on June 1, 1979." These statutes clearly approved the May 2, 1979 legislative regulation, as it existed on April 2, 1980 and June 1, 1979.

The Conference Statement, relied on by appellees, was issued on March 7, 1980, after the adoption of the legislative regulation of May 2, 1979. The Conference Statement stated in part the following:

> The conference agreement follows the Senate amendment. For windfall profit tax purposes, therefore, newly discovered oil includes production from a property which did not produce oil in commercial quantities during calendar year 1978. Thus, it includes production from a property on which oil was produced in 1978 if that production was incident to the drilling of exploratory or test wells and was not part of continuous or commercial production from the property during 1978.

1980 U.S. Code Congressional and Administrative News 410, 642 at 650–651.

These portions of the Conference Statement did not, and could not, retroactively amend the May 2, 1979 legislative regulation of the DOE, affirmed in the text of the Windfall Profits Act as summarized above. And, as an aid to interpretation of the May 2, 1979 legislative regulation, the Conference Statement is entitled to little weight because: (1) it is not a part of the legislative or administrative history of the May 2, 1979 legislative regulation; (2) it is not a contemporaneous interpretation, and (3) it is contrary to the May 2, 1979 legislative regulation as reasonably interpreted by Ruling 1980–3, the official administrative interpretation of the legislative regulation. As stated by the Supreme Court in *Regional Rail Reorganization Act Cases,* 419 U.S. 102 at 132–133, 95 S.Ct. 335 at 353, 42 L.Ed.2d 320 at 347 (1974):

> But post-passage remarks of legislators, however explicit, cannot serve to change the legislative intent of Congress expressed before the Act's passage . . . . Such statements "represent only the personal views of these legislators, since the statements were [made] after passage of the Act."

This principle of statutory construction is equally applicable to construction of legislative regulations adopted by administrative bodies.

When interpretative Ruling 1980–3 was issued, the OGC was not required to interpret the May 2, 1979 legislative regulation in a manner consistent with the Conference Statement. The OGC considered the Conference Statement in footnote 3 of interpretative Ruling 1980–3. The OGC concluded, however, that the DOE previously decided not to adopt the "commercial quantities" language in the May 2, 1979 legislative regulation, and that the Conference Statement did not retroactively change the definition of newly discovered crude oil adopted in the May 2, 1979 regulation. 45 Fed.Reg. 48579 footnote 3. These conclusions of the OGC are legally correct, reasonable and entitled to deference.

Further, before interpretative Ruling 1980–3 was issued, the DOE initiated appropriate administrative action to resolve the inconsistency between the Conference Statement and the May 2, 1979 legislative regulation of the DOE. After the Conference Statement was issued, the ERA issued the Second Notice of June 23, 1980, proposing amendment of the May 2, 1979 and related legislative regulations. In that Second Notice, which preceded Ruling 1980–3, the ERA expressly cited the Conference Statement; proposed to add, by notice and comment procedures, the "commercial quantities" language to the definition of newly discovered crude oil; and requested comments on the "need for uniformity" of the pricing regulations of the DOE and the Windfall Profits Act. 45 Fed.Reg. 42223. Thereafter, the May 2, 1979 legislative regulation was amended. 45 Fed.Reg. 78588 (November 25, 1980). In the preamble to the amended legislative regulation of November 25, 1980, the ERA explained the following (45 Fed.Reg. 78590):

The overwhelming majority of the comments concerning the definition of "newly discovered crude oil property" favored inclusion of the term "in commercial quantities." We agree that the term should be included in the definition. Its inclusion should result in a similar meaning for newly discovered crude oil under our regulation and under whatever regulations that the IRS ultimately adopts for purposes of the Windfall Profit Tax. Such similarity will lessen the burden on producers and purchasers of complying with our regulations and those of the IRS.

This action by the ERA to add the "commercial quantities" language by an amendment to the May 2, 1979 legislative regulation to resolve the inconsistency between the legislative regulation and the Windfall Profits Act of April 2, 1980, supports our conclusion that interpretative Ruling 1980–3 was a reasonable and legally correct interpretation of the May 2, 1979 legislative regulation, as it existed until the effective date of the November 25, 1980 amendments.

Other subordinate contentions of appellees, including the argument that the OGC did not choose to implement the best policy in issuing Ruling 1980–3, are without merit.

Further, in an opinion by the Honorable Thomas R. Brett of the Northern District of Oklahoma denying a preliminary injunction against enforcement and application of interpretative Ruling 1980–3, Ruling 1980–3 was upheld. *Williams Exploration Company, et al. v. United States Department of Energy, et al.,* 561 F.Supp. 465 (N.D.Okla. 1980).

## CONCLUSION

For the foregoing reasons, the judgment of the District Court is reversed, and the District Court is directed to grant the motion of appellants for summary judgment, and to grant motions for appropriate orders to secure recovery from appellees of the overcharges in violation of Ruling 1980–3 and the May 2, 1979 legislative regulation, interest thereon and costs.