William S. PRICE, Appellant,

v.

David Lee WALTERS and Don Hoover, Appellees.

No. 78483.

Supreme Court of Oklahoma.

May 21, 1996.

Rehearing Denied July 19, 1996.

R. David Lightfoot, David L. Medford Lightfoot & Medford, Oklahoma City, Gary L. Richardson, Gregory G. Meier, Richardson, Meier & Stoops, Tulsa, for Appellant.

Michael C. Turpen, M.D. Bedingfield, Douglas A. Wilson, Chapel, Riggs, Abney, Neal & Turpen, Oklahoma City, for Appellees.

Robert D. Nelon, Gretchen A. Harris, Laura B. Hood, Andrews, Davis, Legg, Bixler, Milsten & Price, Oklahoma City, for amicus curiae.

SIMMS, Justice.

William S. Price, Candidate for Governor on the Republican ticket in the 1990 election, brought a defamation action against David Lee Walters, the Democrat Candidate, and Don Hoover, Walter's media assistant, three weeks prior to the general election. This action arose from a press release issued by Walters and Hoover some eight days prior to the filing of the defamation action.

The trial judge sustained defendants' motion for summary judgment for the reason the press release was privileged under the provisions of 12 O.S.1991, § 1443.1, *infra*. Plaintiff Price timely perfected this appeal.

## FACTS

The alleged defamatory publication concerns Price's involvement in federal court litigation, during the period he held the posi-

tions of First Assistant United State Attorney and United States Attorney for the Western District of Oklahoma. A detailed recitation of the factual background of the federal litigation is necessary to a determination of the controversy.

During a period in which federal "Mandatory Price and Allocation Regulations" for crude oil and petroleum products were in effect, Seneca Oil Company was an independent producer of crude oil and natural gas in Oklahoma. The regulations included price ceilings for the sale of crude oil but exempted "newly discovered crude oil" from the price ceiling regulations. "Newly discovered crude oil" was defined as crude oil "produced ... from a property from which no crude oil was produced in the calendar year 1978." *In re Seneca Oil Co.*, 906 F.2d 1445, 1448 (10th Cir.1990). Penalties for violating the regulations included restitution, or fine and imprisonment. 15 U.S.C. § 754. The oil price controls were discontinued in 1981. However, enforcement action for past violations continued under a savings clause. *Id.*

In 1977 and 1978, Seneca conducted test drilling on five properties in Oklahoma and sold the "test oil" that it recovered. *Id.* Taking the position that the crude oil regulations only applied to production in commercial quantities, Seneca certified that oil produced from the five properties after 1978 was "newly discovered crude oil." Seneca charged market price for that oil from November 1979 to December 1980, and it set aside in a suspense account the difference between the market price it charged and the regulated ceiling price. *Id.*

In July 1980, the Office of the General Counsel of the U.S. Department of Energy (DOE) issued Interpretive Ruling 1980–3, stating that the term "produced" in the regulations meant produced in "*any*" quantity in 1978. *Id.* at 1449. In February 1981, Seneca, as wells operator, sought injunctive and declaratory relief against enforcement of Ruling 1980–3 in the United States District Court for the Western District of Oklahoma.

Price was a trustee for his parents' trusts, and as trustee, was named a party plaintiff in

Seneca's lawsuit, along with other oil companies and individual working interest owners. The Price trusts had interests in the Oklahoma property. Seneca suspended a portion of disbursements to royalty and working interest owners from its sales of crude oil in an amount equal to the difference between the market price and the ceiling price. 906 F.2d at 1448 n. 2. Thus, the record indicates that the trusts had an interest in the suspense fund and would benefit financially from Seneca's successful challenge to the regulation. At the time the action was filed, Price was serving as First Assistant United States Attorney in the Western District. Price became United States Attorney in 1982.

The federal district court granted relief to the plaintiffs and DOE appealed. After finding several of the plaintiffs' appellate contentions to be without merit, *Seneca Oil Co. v. Department of Energy*, 712 F.2d 1384, 1399–1400 (Temp.Emer.Ct.App.1983), the appellate court (TECA) reversed the district court, holding that the pricing regulations were valid and that the oil produced from the Oklahoma properties was miscertified as "newly discovered." The federal appellate court directed the district court "to grant the motion of appellants [DOE and the Secretary of Energy] for summary judgment, and to grant motions for appropriate orders to secure recovery from *appellees* of the overcharges in violation of Ruling 1980–3 and the May 2, 1979 legislative regulation, interest thereon and costs." *Id.* at 1402 (emphasis added). Significantly, the order does not distinguish between Seneca, the other oil company appellees, or the individual working interest owner appellees. No party appealed.

The U.S. Attorney's office in the Western District received the mandate from the federal appellate court but sought judgment on behalf of the DOE *against Seneca only.* Seneca filed for bankruptcy before judgment was entered in favor of the DOE. At the date of the bankruptcy, the overcharges plus interest totaled $1,741,597.77. However, there was only $1,282,706.95 in Seneca's contingency fund at that time because Seneca had used moneys to pay windfall profit taxes and state severance taxes. *In re Seneca*, 906 F.2d at 1449 n. 5.

DOE sought to have a constructive trust declared, and, ultimately, the Tenth Circuit Court of Appeals imposed such a trust in Seneca's bankruptcy proceedings finding that Seneca had *"violated federal law* by overcharging for oil, which is more wrongdoing that the typical creditor-debtor situation." *Id.* at 1451. The Tenth Circuit noted that money recovered by the DOE in the case would "compensate overcharged purchasers" and be distributed as " 'indirect restitution' to states for energy conversation programs and the Federal treasury." *Id.* at 1456.

In 1989, Price resigned as U.S. Attorney to enter the 1990 Oklahoma gubernatorial race. The campaign was not a placid one and intensified as the general election approached. In press releases issued between September 20, 1990 and October 3, 1990, Price accused Walters of ethical violations in the 1986 gubernatorial campaign and claimed that Walters had no philosophical backbone and no political integrity. On September 20, 1990, a front page headline in the *Daily Oklahoman* read: "Bloodbath Hinted in Race For Governor." That paper quoted Price as warning Walters: "If you can't stand the heat, get out of the kitchen." A September 23, 1990, headline in the *Tulsa World* read: "Price–Walters Race Shaping Up to be Down, Dirty."

During his campaigning, Price claimed that, as U.S. Attorney, he was the most investigated candidate for Governor in history: "There is nothing in my background or financial activities that have ever raised a question." The Walters campaign hired an out-of-state independent consultant, Research, Inc., to conduct opposition research.

Jackie Koenig, a Research Inc. employee, came to Oklahoma and discovered references to Price in certain federal court litigation while conducting research at the federal courthouse in Oklahoma City. She obtained copies of the court records, and took them back to California with her.

Mike Carrier was an employee in Don Hoover's office in Oklahoma City. At Hoover's request, Carrier telephoned Koenig on October 7, 1990, and, after they talked, he told her that he wanted to issue a press release regarding the federal litigation. Carrier again spoke to Koenig on the morning of October 8, and he asked Koenig to summarize her findings so that he could incorporate them into a press release to be issued that morning. Carrier drafted the press release after taking notes of Koenig's findings. Koenig testified at deposition to the effect that the press release's emphasis upon Price, rather than Seneca Oil Company, an independent producer of oil and natural gas in Oklahoma, and operator of the wells in which Price, as trustee, had an interest, was contrary to her report.

Neither Walters nor Hoover had any contact with Koenig about her research, and they did not research or investigate the federal litigation themselves. Hoover made some stylistic changes to the press release and approved Carrier's final draft. Walters was in Tulsa, and Hoover read the press release to him over the telephone. After Walters approved the press release for publication, Hoover distributed it to the press.

The press release headline read: "Price Broke Law, Fined $1.74 million By Federal Government." Immediately below, another headline stated: "GOP Gouged Consumers At Gas Pump While Working As Federal Lawyer." The text of the press release continued:

"While working as a federal prosecutor and being sworn to uphold the laws of the country, GOP gubernatorial candidate Bill Price was fined $1.74 million for gouging consumers by selling oil at higher than allowable prices.

Court documents on file in Oklahoma City and Fort Worth on case CV 81–215 and a later bankruptcy case reveal Price and a group of oil companies and investors were found guilty by two courts and the U.S. Department of Energy of violating federal oil price guidelines in the late 1970's.

'We now know what type of businessman Bill Price is,' said Democratic gubernatorial candidate David Walters. 'He has been accused and found guilty by the very courts he worked in.'

Walters said Price's dealings even go as far as a direct conflict of interest,—being a plaintiff and a defendant in the case and being responsible for the government's case against himself after being named U.S. Attorney."

The press release states that Price, acting as trustee for one of his parents' trusts, and eleven other defendants including Seneca, were found guilty of overcharging consumers as much as $26.80 per barrel for oil when the defendants sold oil from five properties in Major County, Oklahoma in 1978 and 1979. The press release further stated that court documents showed that Price and his family trust were "working interest owners in various of the five properties ... sharing in the revenues from the shares of crude oil produced on these properties." The release states that the U.S. Department of Energy fined Price and the others for overcharging more than the legally allowable per barrel amount of approximately $14.00, and according to court documents, defendants repeatedly fought against repaying the overcharges.

The release next stated that Seneca filed bankruptcy but the battle to avoid paying the judgment continued, and the release referred to one federal document where the federal lawyers charged that the defendants were improperly shuffling "money in and out of what the government believes is a trust account set up" to pay the judgment. The release states that the U.S. Department of Energy filed suit to force the defendants to pay the judgment, and the 10th Circuit Court of Appeals ruled in June 1990 that the judgment should be paid. Again, the press release referred to a court document where the court said the defendants "violated federal law by overcharging for oil, which is more wrongdoing than the typical creditor-debtor situation."

The press release concludes with quotes from Walters:

" 'Bill Price has based his campaign on his record as a law-abiding U.S. Attorney and as a businessman,' Walters said.

'Well, this is his record—a $1.74 million fine for gouging consumers and driving up the price of gasoline and being financially tied to a firm that filed bankruptcy,' Walters said.

'What other skeletons are in Bill Price's closet?' Walters asked."

## I.

## CONTENTIONS ON APPEAL

On appeal from the trial court's grant of summary judgment, Price claims that there were factual controversies over whether (1) the press release was privileged; (2) whether the press release was a fair and substantially accurate report of judicial proceedings; (3) whether the press release was an expression of opinion regarding a judicial proceeding; (4) whether the press release is a criticism upon any official act of appellant; (5) whether the press release falsely imputes a crime to him; and, (6) whether defendants acted with malice. He argues that the federal court proceedings do not support the allegations in the press release, and attacks the headlines of the press release and the use of the terms "broke the law", "violated federal law", "accused", "defendant", "found guilty" and "involved in a direct conflict of interest" as libelous per se. Price's claim of libel per se is grounded upon the contention that the language of the press release "engenders in the mind of the reader a conclusion, impression, or opinion of plaintiff that is defamatory ..." *Winters v. Morgan*, 576 P.2d 1152, 1154 (Okla.1978). This rule, of course, would not apply to privileged speech. Because we find below that the statements were privileged we need not address Price's assertion of libel per se.

On the other hand, Defendants point out that working interest owners did own a considerable percentage of Seneca's suspense fund—this percentage of ownership being de-termined by the percentage of ownership of the crude oil that Seneca sold on their behalf. Defendants also point out that the TECA judgment pertained to all named appellees, but the U.S. Attorney's Office—where Plaintiff was the U.S. Attorney—did not seek recovery against the working interest owner appellees, and, thus, did not carry out the mandate as directed.

Defendants maintain that the press release appropriately called attention to Price's conflict of interest, which was apparent on the face of the federal documents. Plaintiff states in his brief in chief that he recused himself from the case and "did not appear to act with any impropriety." However, Defendants maintain that the court documents do not show that he followed recusal procedures. According to Defendants, the working interest owners wanted to keep the funds obtained through illegal overcharges and they ratified the crude oil miscertifications by joining in Seneca's lawsuit. Defendants claim that Price was trustee of his family's trust and his liability under the TECA ruling was in proportion to his family's interest in the suspense fund. They further claim that Price could have refused to join in the lawsuit or dismissed his claims but did neither. Finally, Defendants claim that Plaintiff was "trying to prove the press release untrue by ignoring the TECA mandate and focusing on the U.S. Attorneys' incomplete fulfillment of the mandate."

To this, Price responds that "[f]or some reason unknown ... he was named as the trustee for the trusts when the working interest owners joined Seneca in its suit against the DOE." And, the TECA's mandate to recover overcharges from "appellees" was "interpreted" by the DOE as meaning only Seneca and the other oil company appellees.

## II.

## THE ISSUE OF PRIVILEGE

■ Although the summary judgment motion presented two bases purportedly enti-

tling Defendants to judgment, the trial court found that the action was barred based upon statutory privilege. Title 12 O.S.1991, § 1443.1, provides, in pertinent part:

"A. A privileged publication or communication is one made:

\*   \*   \*   \*   \*   \*

Third. By a fair and true report of any legislative or judicial or other proceeding authorized by law, or anything said in the course thereof, and *any and all expressions of opinion in regard thereto, and criticisms thereon,* and any and all criticisms upon the official acts of any and all public officers, except where the matter stated of and concerning the official act done, or of the officer, falsely imputes crime to the officer so criticized.

B. No publication which under this section would be privileged shall be punishable as libel." (Emphasis added)

In *Crittendon v. Combined Communications Corp.,* 714 P.2d 1026 (Okla.1986), this Court upheld our well-settled rule that where the circumstances of a publication are not in dispute, the issue of whether the publication was privileged under section 1443.1 is a question of law for the court. There a physician brought a defamation action against a television station for allegedly libelous broadcasts concerning a report of a hearing where default judgment was entered against him for malpractice. We held the trial court committed reversible error in submitting the question of statutory privilege to the jury, thereby reaffirming our allegiance to the general rule adopted in *Tuohy v. Halsell,* 35 Okla. 61, 128 P. 126 (1912), and *Cobb v. Oklahoma Publishing Co.,* 42 Okla. 314, 140 P. 1079 (1914), that:

"The rule in such cases is that, where there is no dispute as to the circumstances under which a publication is made—that is, where there is no dispute as to what the publication was, what it was about, and who made it—or where the language in the publication is plain and unambiguous, it is a question of law for the court to deter-

mine whether or not such publication was privileged." 714 P.2d at 1028 (quoting *Cobb v. Oklahoma Publishing Co., supra* ).

We then determined as a matter of law that the broadcasts were substantially accurate and therefore privileged under 12 O.S. 1981, § 1443.1 as a fair and true report of the proceeding.

Defendants do not dispute publication of the press release. See *McCutcheon v. State,* 746 P.2d 461 (Alaska 1987); *Munafo v. Helfand,* 140 F.Supp. 234 (S.D.N.Y.1956). Likewise, the content of the press release, who made it and what it is about, is not in dispute. The court documents show that Price was a named party plaintiff in litigation, where the plaintiffs sought to retain benefit of sales of crude oil at market price, and a federal court found that price to be an overcharge in violation of federal law. The text of the federal court opinion unequivocally directed the district court to grant orders to secure recovery for overcharges against "appellees", which included *all* of the plaintiffs in the declaratory judgment action. The DOE, represented by the U.S. Attorney's office, proceeded against only Seneca.

The statutory privilege of section 1443.1 extends further than "fair and true reports of judicial proceedings." It applies to "any and all expressions of opinion in regard thereto, and criticisms thereon," as well as to "criticisms upon the official acts" of public officers. Read in context, the components of the press release are inferences from the court records together with expressions of candidate Walters' opinions. They are largely his comment, criticism and personal judgment on his political opponent's role in federal court litigation, which occurred when that opponent held public office.

Price's principal complaint regards the use of words such as "defendant" which give the impression that he was a criminal defendant, found guilty, and fined. However, although Price and others were plaintiffs, they were seeking to *defend* or answer assertions by the government that they had violated federal pricing laws. The statement that "Price

Broke Law" and was "Fined" is slanted, but the federal court order did direct recovery of "overcharges in violation of Ruling 1980–3," and, under federal law, those moneys recovered would "compensate overcharged purchasers" and be distributed to the state as "indirect restitution." The statement that Price "gouged consumers" is clearly a nonactionable "judgmental statement" which is "opinionative and not factual in nature." *Miskovsky v. Oklahoma Publishing Co.,* 654 P.2d 587, 593 (Okla.1982), *cert. denied,* 459 U.S. 923, 103 S.Ct. 235, 74 L.Ed.2d 186 (1982).

The concluding quotes from Walters and references to "skeletons" in Price's closet are more of the same—personal opinion and hyperbole. These kinds of rhetorical expression of opinion are protected, and rightly so, because of the "realization that there exists a profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide open, and that the discussion may well include vehement, caustic and sometimes unpleasantly sharp attack on public officials." *Jurkowski v. Crawley,* 637 P.2d 56, 58 (Okla.1981). Where the tone of a piece is "pointed, exaggerated and heavily laden with emotional rhetoric and moral outrage," readers are notified "to expect speculation and personal judgment." *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 32, 110 S.Ct. 2695, 2712, 111 L.Ed.2d 1 (1990) (Brennan, J., dissenting).

The subject press release does use words that might be considered by some to be inappropriate. However, in *Jurkowski,* this Court recognized some constitutional protection for clearly erroneous statement, which we do not find the press release to be, when it recognized:

"Aside from the inevitable chance of frank abuse there is the fact that erroneous statement is inevitable in free debate, and that those erroneous statements must additionally be protected if the freedoms of expression are to have the breathing space they need to survive, therefore the constitutional privilege does not turn upon the truth, popularity or social utility of the ideas and beliefs considered." 637 P.2d at 58.

Importantly, the Restatement (Second) of Torts, § 581A, comment (f), provides: "It is not necessary to establish the literal truth of the precise statement made. Slight inaccuracies of expression are immaterial provided that the defamatory charge is true in substance."

While our decision rests on § 1443.1 privilege, it is nonetheless important to consider plaintiff's claims in light of extant first amendment "fact vs. opinion" analysis. In *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Supreme Court declared constitutional protection for the expressions of opinion, immunizing them from defamation consequences, stating:

"We begin with the common ground. Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.[1] But there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues. *New York Times Co. v. Sullivan,* 376 U.S., at 270, 84 S.Ct., at 721.... Although the erroneous statement of fact is not worthy of constitutional protection, it is nevertheless inevitable in free debate." 418 U.S. at 341–42, 94 S.Ct. at 3007 (Footnote omitted).

Since *Gertz,* this distinction between fact and opinion has been seen as an adjudication of constitutional dimension, necessary to provide requisite First Amendment protection to opinions. Speaking to this point in *Ollman*

---

**1.** This statement from *Gertz* was recently quoted with approval by the U.S. Supreme Court in *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 503–04, 104 S.Ct. 1949, 1961, 80 L.Ed.2d 502 (1984).

*v. Evans,* 750 F.2d 970, 978 (D.C.Cir.1984), the court agreed with the "overwhelming weight of post-*Gertz* authority" that this determination is a decision which courts must make as a matter of law. That court also observed that even though the judicial methods used to distinguish between fact and opinion vary, the determination of the issue as one of law serves important First Amendment values since the predictability of decisions is enhanced when they are made according to announced legal standards from published case law.

Judge Robert Bork, in his concurring opinion in *Ollman v. Evans, supra,* spoke of statements which the reader should perceive as functionally more "opinion" than "fact" because they appear in the context of swirling political controversy. Like the statements at issue in *Ollman,* the statements here are not actionable; they fall into the category the U.S. Supreme Court calls "rhetorical hyperbole." 750 F.2d at 994; *Greenbelt Cooperative Publishing Ass'n v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1974); *National Ass'n. of Letter Carriers v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974). Of special relevance to us are Judge Bork's analyses of the impact of libel actions on the political arena and his observations regarding individuals who have become the subject of spirited public debate by voluntarily placing themselves in that arena.

In part he stated:

"It arouses concern that a freshening stream of libel actions, which often seem as much designed to punish writers and publications as to recover damages for real injuries, may threaten the public and constitutional interest in free, and frequently rough, discussion. Those who step into areas of public dispute, who choose the pleasures and distractions of controversy, must be willing to bear criticism, disparagement, and even wounding assessments. Perhaps it would be better if disputation were conducted in measured phrases and calibrated assessments, and with strict avoidance of the ad hominem; better, that is, if the opinion and editorial pages of the public press were modeled on The Federalist Papers. But that is not the world in which we live, ever have lived, or are ever likely to know, and the law of the first amendment must not try to make public dispute safe and comfortable for all the participants. That would only stifle the debate."

\* \* \* \* \* \*

"There are several factors that convince me Ollman cannot maintain this action. These considerations are of the type that the Supreme Court and other courts have deemed important: the danger to first amendment freedoms and the functional meaning of the challenged statement as shown by its context and its qualities as recognizable rhetorical hyperbole. The factors here are: Ollman, by his own actions, entered a political arena in which heated discourse was to be expected and must be protected; the 'fact' proposed to be tried is in truth wholly unsuitable for trial, which further imperils free discussion; the statement is not of the kind that would usually be accepted as one of hard fact and appeared in a context that further indicated it was rhetorical hyperbole."

\* \* \* \* \* \*

"In deciding a case like this, therefore, one of the most important considerations is whether the person alleging defamation has in some real sense placed himself in an arena where he should expect to be jostled and bumped in a way that a private person need not expect. Where politics and ideas about politics contend, there is a first amendment arena. The individual who deliberately enters that arena must expect that the debate will sometimes be rough and personal." 750 F.2d at 993, 1002.

We conclude the lower court properly engaged in a *Crittendon* analysis and correctly found the subject press release privileged under the statute. The press release is substantially accurate and is a fair and true

report of the basic facts. The expressions of opinion in regard to those facts are not actionable. Those statements fall exclusively within the category of "rhetorical hyperbole"; they are privileged under 12 O.S.1991, § 1443.1, and protected under the constitution. Therefore, it is unnecessary to address the issue of malice.

For the above and foregoing reasons, the judgment of the district court is AFFIRMED.

KAUGER, V.C.J., SIMMS, J., JOHNSON, REIF, and STUBBLEFIELD, Special Judges, in lieu of HODGES, SUMMERS, and WATT, JJ. who certified their disqualifications, concur.

ALMA WILSON, C.J., and LAVENDER, HARGRAVE and OPALA, JJ., dissent.

ALMA WILSON, Chief Justice, with whom LAVENDER, HARGRAVE and OPALA, JJ., join, dissenting:

The majority opinion refers to the press release as rhetorical hyperbole, and concludes that there is no dispute that the basic facts in the release are true. The majority then affirms the summary judgment by the trial court. To this I must dissent.

The majority opinion does not address the issue of whether the press release is libel per se because the opinion finds that the statements were privileged. Title 12 O.S.1991, § 1443.1(A)(Third) defines a privileged communication as one made:

"By a fair and true report of any legislative or judicial or other proceeding authorized by law, or anything said in the course thereof, and any and all expressions of opinion in regard thereto and criticisms thereon, and any and all criticisms upon the official acts of any and all public officers, except where the matter stated of and concerning the official act done, or of the officer, falsely imputes crime to the officer so criticized."

If under the evidence reasonable persons might reach different inferences or conclu-

sions, summary judgment must be denied. *Buckner v. General Motors Corp.*, 760 P.2d 803, 812 (Okla.1988). Because reasonable persons could disagree on whether the content of the press release in the case at bar was fair and true, summary judgment was improper.

The majority cite *Crittendon v. Combined Communications Corp.*, 714 P.2d 1026, 1028 (Okla.1986), to support the statement that where the circumstances of the publication are not in dispute then the issue of whether the publication was privileged under section 1443.1 is a question of law for the court. The *Crittendon* Court labeled whether the television broadcast was a "fair and true report" the "core issue" of the case. That case involved the television broadcast of a default judgment against a physician in a medical malpractice case and its defamatory effect on the physician. *Crittendon* observes: "A statement is substantially accurate if its 'gist' or 'sting' is true, that is, if it produces the same effect on the mind of the recipient which the precise truth would have produced." *Crittendon*, 714 P.2d at 1029, quoting *Williams v. WCAU–TV*, 555 F.Supp. 198, 202 (E.D.Pa.1983). The Court concluded that the "gist of the reported statement was the same as the statement actually made during the judicial proceeding." But reasonable persons could find that the gist of the press release in the case at bar was neither fair nor true, and that it would not produce the same effect in the mind of the reader as the precise truth would have produced. The case at bar is not a *Crittendon* case.

The headline of the press release states: "Price Broke Law, Fined $1.74 million By Federal Government." The facts are that Seneca Oil Company sought injunctive and declaratory relief against the enforcement of a Department of Energy (DOE) Interpretive Ruling that would continue a price ceiling regulation on oil Seneca discovered in 1977 and 1978. Seneca subsequently sold that oil at the higher market price in 1979 and 1980. Seneca set aside the difference in an interest-bearing suspense account. *In re Seneca Oil Company*, 906 F.2d 1445, 1448 (10th Cir.

1990). Seneca actually prevailed on its interpretation of the federal regulations in district court, which held that the DOE's ruling was invalid. *In re Seneca Oil Company*, 906 F.2d at 1449. The Temporary Emergency Court of Appeals reversed the district court, holding that the DOE's interpretation of the pricing regulations was valid "and that Seneca had violated the pricing regulations by miscertifying its crude oil and by overcharging for oil." *In re Seneca Oil Company*, 906 F.2d at 1449, citing *Seneca Oil Co. v. Department of Energy*, 712 F.2d 1384 (Temp.Emer.Ct.App.1983). The Tenth Circuit's report of the holding in that case correctly superimposes the word "Seneca" over the word "appellees" in quoting the order of remand by the Temporary Emergency Court of Appeals. The Tenth Circuit states, "The TECA remanded to the district court 'to grant motions for appropriate orders to secure recovery from [Seneca] of the overcharges in violation of Ruling 1980–3 and the May 2, 1979, legislative regulation, interest thereon and costs.'" *In re Seneca Oil Company*, 906 F.2d at 1449, citing *Seneca Oil Co.*, 712 F.2d at 1402. Apparently the Tenth Circuit Court of Appeals viewed the use of the term "appellees" as a misstatement on the part of the Temporary Emergency Court of Appeals.

Given the facts taken from the two Seneca cases, two sources for the press release, is the gist of the entire report fair and true? The headline does not appear to be supported by the two Seneca cases. The Tenth Circuit case specifically holds "that the DOE's claim is not a fine, penalty, or forfeiture" and specifies the court's reasoning for its holding. *In re Seneca Oil Company*, 906 F.2d at 1455.

The subheadline read: "GOP Candidate Gouged Consumers at Gas Pump While Working as Federal Lawyer." What "basic fact" is true about this statement of "rhetorical hyperbole?" It is true that the appellant was the GOP candidate. The style of the Temporary Court of Appeals case lists one of the appellees as "William S. Price as Trustee for Joel S. Price, Virginia K. Price Trust."

As trustee for his parents' trusts, he certainly was not responsible for the actions of Seneca Oil Company. To be responsible for "gouging" consumers the actions of Seneca would first have to be imputed as an act of the working interest owners, then their actions would have to be imputed to the trustee. That is too far removed for even arguable liability.

What about the text of the press release? What may reasonable persons conclude? "While working as a federal prosecutor and being sworn to uphold the laws of the country, GOP gubernatorial candidate Bill Price was fined $1.74 million for gouging consumers by selling oil at higher than allowable prices." It is true that Bill Price was the GOP gubernatorial candidate and that he was a federal prosecutor, but, as established above, the Tenth Circuit specifically held that no fines or penalties were levied.

The next sentence reads: "Court documents on file in Oklahoma City and Fort Worth on case CV 81–215 and a later bankruptcy case reveal Price and a group of oil companies and investors were found guilty by two courts and the U.S. Department of Energy of violating federal oil price guidelines in the late 1970's." Is the gist of this sentence that the appellant was found guilty in a criminal case and subsequently he filed bankruptcy along with others? Does the "gist" or "sting" of that sentence produce the same effect on the mind of the recipient that the precise truth would have? Reasonable persons could conclude otherwise.

" 'We now know what type of businessman Bill Price is,' said Democratic gubernatorial candidate David Walters. 'He has been accused and found guilty by the very courts he worked in.'" Based on the content of the two Seneca cases, reasonable persons could find that the content is false.

The case at bar is arguably more egregious than *Winters v. Morgan*, 576 P.2d 1152 (Okla.1978), in which the district court sustained a general demurrer to the petition and dismissed with prejudice. This Court reversed and remanded. In *Winters*, a news-

paper complained that the state treasurer, who had been indicted by a federal grand jury, was seeking to move the trial out of Oklahoma City because he could not receive a fair trial here due to pretrial publicity. The newspaper commented that the state treasurer and the others indicted "are just as guilty in Guymon in the panhandle, Idabel in Southeastern Oklahoma, Bartlesville in the northeast, Lawton in the southwest, or right smack in downtown Oklahoma City. . . . Seeking out possible weak juries or less fair federal judges is not the American Way of justice. . . ." The *Winters* Court, after considering the article in its entirety, its thought, ideal, impression, or opinion conveyed to the reader, found that it engendered in the mind of the reader a conclusion, impression, or opinion of the state treasurer that was defamatory, tending to expose him to public hatred, contempt and obloquy. *Winters,* 576 P.2d at 1154. This Court observed that the logical conclusion of a reader is that the plaintiff is guilty of the crime of which he has been charged, and that he is seeking a weak judge or incompetent jury to acquit him in spite of his guilt. The Court found that the language was libelous per se, and that there was no privilege since it falsely imputed the commission of a crime to a public officer. *Winters,* 576 P.2d at 1154.

The *Winters* Court found the language of the newspaper article to be libelous per se because the editorial could have indicated that the state treasurer "was just as innocent or guilty in the country as he was in the city." *Winters,* 576 P.2d at 1154. The Court remanded the case for a jury trial. *Winters,* 576 P.2d at 1154. The editorial in *Winters* is not nearly as explicit as the press release in the case at bar. The state treasurer had been indicted by a grand jury. The appellant had not been indicted for any crime, much less convicted.

The Supreme Court of Nevada affirmed a defamation award in favor of a gubernatorial candidate against a television broadcasting company and its majority shareholder in *Nevada Indep. Broadcasting Corp. v. Allen,* 99 Nev. 404, 664 P.2d 337 (1983). In a live televised interview with Allen, the gubernatorial candidate, Hernstadt, who was the majority stockholder in the company made three remarks that the Nevada court agreed were defamatory. Allen had hired Golden West Advertising Agency to handle his campaign. Hernstadt discovered in the afternoon prior to the broadcast that a check in the amount of $697.00 for political advertising and issued by the agency, had been returned to the station because of insufficient funds. While on the air, Hernstadt initially accused Allen of passing a check with insufficient funds, then he mentioned the advertising agency, but questioned what a political candidate who did not pay his bills would do if allowed to handle state funds. Finally, he referred to another candidate as honorable in a manner intended to contrast him with Allen. *Nevada Indep. Broadcasting Corp.,* 99 Nev. at 408, 664 P.2d at 340. The Nevada court concluded that the comments taken as a whole clearly implied a want of qualities expected of a public officer and supported a case for slander per se. *Nevada Indep. Broadcasting Corp.,* 99 Nev. at 410, 664 P.2d at 341. The court noted that the questioning of Allen's handling of state funds was really the defamatory sting, which arose from the factual statement that Allen did not pay his bills. *Nevada Indep. Broadcasting Corp.,* 99 Nev. at 412, 664 P.2d at 343, n. 4. Like *Winters,* the Nevada case would appear to be less flagrant than the facts before this Court in the case at bar.

I would submit that reasonable persons could conclude that the appellees published a defamatory statement that was false, and unprivileged. This case is not one in which summary judgment is appropriate.

This state ought to be the vanguard in protecting its public figures against outright falsehoods. Free speech was intended to protect the public by allowing issues to be freely and vigorously discussed. Grave public injury is certain if this state tolerates reckless disregard for the truth in political campaigning. Such is certain to diminish public confidence. Those who seek public office must be responsible for their defama-

tory statements that injure campaign opponents and that egregiously destroy the integrity of our representation. For these reasons I would reverse the judgment of the district court and remand for trial.

HARGRAVE, Justice, dissenting:

The only issue before this court is whether the trial court erred in granting summary judgment to the defendants on the grounds that the press release involved was privileged as a matter of law under 12 O.S.1981 § 1443.1 as a "fair and true" report of a judicial proceeding. The trial judge ruled *only* that the statements were privileged as a fair and true report of a judicial proceeding. I would reverse and remand because the question of whether the report in this case is "fair and true" is a question for the jury because readers could differ on the meaning of the press release. The case involves only interpretation of Oklahoma law on privilege; federal cases are not necessary to make that determination.

Title 12 O.S.1991 § 1443.1 provides:

"A. A privileged communication is one made:

Third. By a fair and true report of any legislative, judicial or other proceeding authorized by law, or any thing said in the course thereof, and any and all expressions of opinion in regard thereto, and criticisms thereon, and any and all criticisms upon the official acts of any and all public officers, except where the matter stated of and concerning the official act done, or of the officer, falsely imputes crime to the officer so criticized.

B. No publication which under this section would be privileged shall be punishable as libel."

It is immaterial, in making the determination, whether the plaintiff is a public figure, nor is actual malice an element to be considered. The sole question is whether the release is privileged; if so, it is not libelous.

The third paragraph of § 1443.1 contains three privileges: a) the fair and true report

of a judicial proceeding is privileged, 2) any and all expressions of opinion in regard thereto and criticisms of such report are privileged, and 3) any and all criticisms upon the official acts of public officers are privileged unless a crime is falsely imputed thereby. In order for opinion to be privileged, the report itself must be privileged by being a fair and true report of the judicial proceeding. That is, only when it is first determined that the report is fair and true can the determination be made whether expressions of opinion in regard thereto are privileged. The matter before us involves only the first question—whether the report is fair and true. To say as a matter of law that the report at issue is a fair and true report because the statements are expressions of opinion begs the question, in my opinion.

In *Crittendon v. Combined Communications Corp.*, 714 P.2d 1026 (Okla.1986) this Court determined that the report of a judicial proceeding in that case was privileged as a matter of law. We found there that a "substantially accurate" account will suffice if it conveys to the persons who read it a substantially correct account of the proceedings. Where the gist of the entire report was both fair and true, we found that the report would be protected by statutory privilege. We were able to so determine in that case because the circumstances of the publication: the content, who made it, and what it was about were not in dispute. Because the facts were undisputed, we said, the trial court should have resolved the issue of privilege as a matter of law. *Crittendon* does not stand for the proposition that every question of statutory privilege is to be decided as a matter of law. Only where the facts are not in dispute is the issue to be decided as a matter of law.

The case at bar is different. The content of the press release and what it was about is disputed. Because the press release is not an essentially verbatim account of the judicial proceedings, we cannot say as a matter of law whether the publication is absolutely privileged and *Crittendon* does not apply. It is a fact question for the jury whether the

press release is a fair and true or substantially accurate report of a judicial proceeding.

I believe that the disputed nature of the contents is illustrated by making the argument that the press release, as a matter of law, *is not* a fair and true report of a judicial proceeding under the statute. It can be argued that the report is not a fair and true report of a judicial proceeding for the reason that the report is neither fair nor true. The press release substitutes "Bill Price" for Seneca Oil Company in reporting the proceedings. The "wrongdoing" quoted by the Tenth Circuit was made in Seneca's *bankruptcy* appeal, a proceeding to which Price was not even a party.

A recap of the underlying proceedings illustrates the liberties taken by defendants in their press release. William S. Price as Trustee of the Joel S. Price, Virginia K. Price Trust is a named party in one proceeding only, CIV 81–215T, before the U.S. District Court for the Western District of Oklahoma. In that proceeding he is one of the named *plaintiffs*, along with Seneca Oil Company and others, seeking a declaratory judgment that the ruling on which the Department of Energy relied was invalid. The district court ruled *for the plaintiffs*, finding that the DOE interpretation was invalid, and ergo, that Seneca was correct in its interpretation as to the classification of the oil produced.

The appeal of CIV–81–215 to an Emergency Temporary Court of Appeals, reported at 712 F.2d 1384, reversed the district court, finding, after 11 pages of discussion, that the DOE ruling was valid. The district court was directed to grant motions for appropriate orders to secure recovery from appellees of the overcharges in violation of Ruling 1980–3 and the May 2, 1979 legislative regulation, plus interest and costs. The temporary Court of Appeals stated: "... district court is directed to grant [DOE's] motion for summary judgment and to grant motions for appropriate orders to secure recovery from *appellees* of the overcharges in violation of Ruling 1980–3 and the May 2, 1979 legislative regulation, interest thereon and costs."

There is no statement in the judicial proceeding to which Price was a named party of wrongdoing, gouging, or any finding of guilt regarding illegal activity on the part of any of the appellees. The only words used are "overcharges in violation of Ruling ..." and statements that *Seneca* miscertified the oil.

Before judgment was entered, Seneca filed for Chapter 11 reorganization. Price was not a party to the Seneca bankruptcy. The Department of Energy filed a proof of claim for the $1,741,597.77 amount of the overcharges plus interest to date of bankruptcy. The DOE asserted a constructive trust over the approximately $1.3 million that Seneca had held in a contingency fund pending outcome of interpretive ruling by DOE. The district court found that a constructive trust should be imposed because it concluded that Seneca's illegal overcharging "clearly and unequivocally shows wrongdoing." *In re Seneca Oil Co.,* 76 B.R. 813.

On appeal of the bankruptcy orders in the Seneca bankruptcy, the Tenth Circuit found that although the question was a close one, under Oklahoma law there was sufficient evidence of wrongdoing to support imposition of a constructive trust, to wit: "more wrongdoing than the typical debtor creditor situation". This language arose in Seneca's bankruptcy, not in the underlying case where Price was a party as Trustee. Price was not a party to the bankruptcy; the press release's references to Price as a "defendant" along with Seneca is more than mere opinion or comment. It is a misstatement of the parties to the proceeding.

There is more here than simple exaggeration or hyperbole, or expression of opinion on a fair and true report of a judicial proceeding. There is, arguably, misrepresentation. The headline of the press release states, "Price Broke Law, Find $1.74 million by Federal Government." There is nothing in the body of the press release to negate the imputation that Price alone was fined $1.74 million. The statement that *Price* and a group of oil companies and investors were found *guilty* by *two courts* and the U.S.

Department of Energy of violating federal oil price guidelines is false. At the very least there is a disputed question of fact whether the reports concerning Seneca's bankruptcy proceeding are true as to Bill Price, Trustee, and a difference of opinion as to whether they are fair.

Whether the Seneca bankruptcy proceeding, in which Bill Price was not a named party, was a judicial proceeding even involving Bill Price, Trustee, is a question of fact for the jury. While it may be true that Bill Price, as Trustee, did have an interest in the Seneca bankruptcy and that a portion the money involved there was attributable to Bill Price, Trustee, the opposite may be true. Whether the report is fair is another question to be decided. In any event, whether the press release was a fair and true report of a judicial proceeding in this case cannot be decided as a matter of law, but is a question for a jury to decide.

ALMA WILSON, C.J., and LAVENDER and OPALA, JJ., concur in the views herein expressed.

OPALA, Justice, with whom ALMA WILSON, Chief Justice and LAVENDER and HARGRAVE, Justices, join, dissenting.

Holding that the press release in issue is a *fair and true* report of two separate judicial proceedings,[1] the court affirms a nisi prius summary judgment which extends the protection of the 12 O.S.1991 § 1443.1 [2] statutory privilege to Walters and Hoover [collectively called "Walters"]. I must recede from the court's pronouncement because its analysis (a) is in discord with my notions of Price's right to a trial by jury under the state constitution and (b) rests in part upon evidentiary materials the trial judge did not examine in reaching his decision.

This case is *neither about* state or federal constitutional protection of political speech *nor about* the rules of engagement that govern election contests between rival candidates for a political office. What engages us in this appeal *is solely the procedure* that was Price's due when Walters' quest for relief by summary judgment came under the trial court's scrutiny.

## I

## THE ANATOMY OF LITIGATION

The summary judgment before us today rests *solely* on Walters' *state-law* statutory defense of privilege.[3] Evidentiary materials in the record—insofar as they relate to federal constitutional impediments to Walters' liability [4] (and the concomitant lack of actual malice) or to the affirmative state-law defens-

---

1. The legal actions described in the press release are (1) Seneca Oil Company, Seneca Exploration Company, Harry M. Diamond, Inc., Par Oil Company, Eason Oil Company, Ladd Petroleum Company, Southland Royalty Company, Robert L. Adair, William S. Price as Trustee for Joel S. Price, Virginia K. Price Trust, Samuel F. Wilson, Jr., Bill J. Sparks and Lou Holtz v. U.S. Department of Energy, U.S. District Court for the Western District of Oklahoma, Case No. 81–215–T and (2) In re Seneca Oil Company, U.S. Bankruptcy Court for the Western District of Oklahoma, Case No. BANKR–85–825–A.

2. The pertinent terms of 12 O.S.1991 § 1443.1 are:
   "A. A privileged publication or communication is one made:
   \*      \*      \*      \*      \*      \*
   Third. By a *fair and true report of any* ... *judicial* ... *proceeding* authorized by law, or anything said in the course thereof, and any

and all expressions of opinion in regard thereto, and criticisms thereon, and any and all criticisms upon the official acts of any and all public officers, except where the matter stated of and concerning the official act done, or of the officer, *falsely imputes crime* to the officer so criticized." [Emphasis mine.]

3. For the statutory text creating this privilege, *see supra* note.

4. For a discussion of the constitutional impediments to liability in issue, see *infra* section II A.

es based on common-law privilege of fair comment, estoppel or waiver—did *not* undergo judicial examination at nisi prius.

## II

## ALTHOUGH SUMMARY JUDGMENT BASED ON OTHER GROUNDS(REFLECTED IN THE PROBATIVE MATERIALS) MIGHT HAVE PASSED OUR MUSTER, IT CANNOT BE RESTED ON THE BAR OF § 1443.1 PRIVILEGE

The court today intermixes the affirmative defense of § 1443.1 privilege with the zone of protection afforded under the First Amendment-grounded *New York Times Co. v. Sullivan*[5] and its progeny to affirm summary judgment for Walters. In this process, the separate and distinct origins and outer limits of these concepts become distorted and misshaped. Our focus is drawn away from the stubborn fact that the trial judge failed to examine the probative materials in the record with a view to measuring their sufficiency for summary adjudication based on the tendered federal-law questions.

### A

*Conflicting Inferences May Be Drawn From Uncontroverted Facts On Which Walters Relied For Summary Judgment On His § 1443.1 Defense*

The trial court's denial of a jury trial on the issue of privilege rests on Walters' materials tendering undisputed facts from which, in my view, conflicting inferences may be drawn. This posture of the record calls for

application of the *general rule* that whenever uncontroverted proof lends support to conflicting inferences, the choice to be made between opposite alternatives presents an issue of fact for the trier.[6]

One of the § 1443.1 privilege's elements is that the report of the judicial proceeding be "fair and true".[7] Some of the remarks said to defame Price were drawn from the record in Seneca Oil Company's bankruptcy. Price was not a party to this proceeding. Whether Walters' characterization of the bankruptcy proceedings was fair and true presents a question of fact to be resolved by a jury.

### B

*The Notion Of Extending Disparate Procedural Treatment To Similarly Situated Litigants Offends The Procedural Symmetry Mandated By Art. 5, § 46, Okl. Const.*

Relying on *Crittendon v. Combined Communications Corp.*,[8] the court holds that when *facts* concerning the defamatory communication in suit *are undisputed*, the § 1443.1 privilege presents a question of law which should be decided by the trial judge. This analysis stops short of accuracy. *Crittendon* does not teach that the § 1443.1 privilege, when interposed, presents an issue of law *in all cases*. What it says is that, because the undisputed facts in *Crittendon* did not support *opposite inferences*, their submission to the jury would have been unwarranted. *Crittendon—a controlling precedent in which I concurred and whose teachings I continue to embrace enthusiastically—is fully consistent with both my analysis today*

---

**5.** 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964).

**6.** *Gray v. Holman*, Okl., 909 P.2d 776, 781 (1995); *Jackson v. Jones*, Okl., 907 P.2d 1067, 1071 (1995); *Wetsel v. Independent School Dist. I-1*, Okl., 670 P.2d 986, 991 (1983); *Thomas v. Hensel Optical Labs*, Okl., 653 P.2d 201, 203 (1982); *Holland v. Dolese Co.*, Okl., 643 P.2d 317, 320 (1982); *Flick v. Crouch*, Okl., 434 P.2d 256, 261 (1967); *Morain v. Lollis*, Okl., 371 P.2d 473, 475 (1962); *Mistletoe Express Service v. Culp*, Okl., 353 P.2d 9, 12 (1960).

**7.** For the pertinent terms of 12 O.S.1991 § 1443.1, see *supra* note. For a discussion of the fair-and-accurate requirement of the common-law *"reporter's privilege"*, see RESTATEMENT (SECOND) OF TORTS § 581A comment j; *see also Wright v. Grove Sun Newspaper Co., Inc.*, Okl., 873 P.2d 983, 992 (1994).

**8.** Okl., 714 P.2d 1026, 1028 (1986).

*and that found in the dissent by Hargrave, J.*

Whether a jury trial on Walters' affirmative defense of statutory privilege was Price's due is an *issue of state law* to be governed by Art. 2, § 19, Okl. Const.[9] It is not a question to be resolved by reliance on federal jurisprudence construing the U.S. Const. amend. 7.[10] Oklahoma remains totally free from all restraints the Seventh Amendment imposes on the judiciary of the Federal Republic.[11]

Today's extension of a different procedural treatment to plaintiffs countering a § 1443.1–privilege defense *from that accorded other litigants*—who stand entitled to a jury trial because opposite inferences on uncontroverted facts are tendered by their cases—destroys the symmetry of Oklahoma's remedial regime and offends the uniformity-of-procedure mandate of Art. 5, § 46, Okl. Const.[12] Even though Walters might ultimately prevail on his interposition of federal-law impediments to liability, today's short cut denies Price the fundamental fairness that is to be

9. The pertinent provisions of Art. 2, § 19, Okl. Const., are:
   "The right to trial by jury shall remain inviolate, except in civil cases wherein the amount in controversy does not exceed One Thousand Five Hundred Dollars...."

10. The U.S. Const. amend. 7 states:
   "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law."

11. *Wilson v. Foster*, Okl., 595 P.2d 1329, 1331 (1979); *Chicago, R.I. & P.R. Co. v. Cole*, 251 U.S. 54, 40 S.Ct. 68, 64 L.Ed. 133 (1919); *Maryland National Insurance Co. v. District Court*, Okl., 455 P.2d 690, 692 (1969).

12. The terms of Art. 5 § 46, Okl. Const., state in pertinent part:
   "The Legislature shall not, except as otherwise provided in this Constitution, pass any local or special law authorizing:
     \*    \*    \*    \*    \*    \*
   *Regulating the practice or jurisdiction of ... in judicial proceedings or inquiry before the courts ... or other tribunals....*" [Emphasis supplied.]

afforded by the framework of orderly process.[13]

Walters' summary judgment rests on the single bar of the state law's statutory privilege. Although a trial court's decision, if correct, may be affirmed on a theory different from that articulated below,[14] *this case* must be remanded because—among other reasons to be stated later in my dissent—the interposed bar of § 1443.1 privilege presents fact issues which were not, but should have been, submitted to a jury.

**C**

### Appellate Courts Must Not Make First-Instance Determinations

The record reflects that the trial judge did not examine the probative materials with a view to determining if Walters' opinions of the judicial proceedings, whether accurate or not, may be afforded protection under the U.S. Const. amend. 1.[15] Appellate courts cannot make first-instance determinations of

See *Reynolds v. Porter*, Okl., 760 P.2d 816, 822 (1988); *Maule v. Independent School Dist. No. 9.*, Okl., 714 P.2d 198, 203–204 (1986). See also *Brown v. Ford*, Okl., 905 P.2d 223, 228 (1995); *Simpson v. Dixon*, Okl., 853 P.2d 176, 183 (1993); *Tate v. Browning–Ferris, Inc.*, Okl., 833 P.2d 1218, 1229 (1992); *Johnson v. District Court of Oklahoma County*, Okl., 738 P.2d 151, 154 (1987)(Opala, J., concurring).

13. *Rodgers v. Higgins*, Okl., 871 P.2d 398, 414 (1993); *Snyder v. Smith Welding & Fabrication*, Okl., 746 P.2d 168, 171 (1986); *Pryse Monument Co. v. District Court of Kay County*, Okl., 595 P.2d 435, 438 (1979). See also *Handy v. City of Lawton*, Okl., 835 P.2d 870, 880 (1992)(Opala, J., dissenting in part).

14. *Wright, supra* note at 992; *Willis v. Nowata Land and Cattle Co.*, Okl., 789 P.2d 1282, 1286–87 (1990); *Davidson v. Gregory*, Okl., 780 P.2d 679, 685 n. 23 (1989); *Utica Nat'l Bank and Trust v. Assoc. Prod.*, Okl., 622 P.2d 1061, 1066 (1981); *Holloway v. Ward*, 84 Okl. 247, 203 P. 217, 219 (1922).

15. The First Amendment, U.S. Const., states in pertinent part that "Congress shall make no law ... abridging the freedom of speech...."

either law or fact. That is the trial court's function in every case.[16]

## III

### THE NATURE OF A 12 O.S.1991 § 1443.1 [17] PRIVILEGE AND THE RIGHT TO TRIAL BY JURY

#### A

The historical antecedents of the affirmative defense of privilege—accorded by the terms of § 1443.1 to those who fairly and truthfully report judicial proceedings—lie in the common law's fair report privilege.[18] The § 1443.1 shield from state-law liability, like its common-law predecessor, *imposes upon the defendant* the duty of interposing the statutory privilege as an affirmative defense and of proving its elements.[19] This notion is distinguishable from the First Amendment-grounded *Sullivan* protection.[20] The latter places *a condition upon a cause of action* for defamation which requires *the plaintiff to allege and prove* that the defendant had knowledge of the communication's falsity or acted in reckless disregard of the truth.[21]

Oklahoma's extant jurisprudence *reflects the diverse allocation* of probative burdens

(1) when plaintiffs bring causes of action in which a federal constitutional impediment is implicated and (2) when defendants raise state-law affirmative defenses.[22] It teaches that whenever a law's provisions would exonerate a defendant from liability on a claim, the plaintiff must bear the probative responsibility for showing that the case does not fall within the exemption that shields the defendant.[23]

This difference in probative burdens militates strongly in favor of remand with instructions that the trial judge *first proceed* to examine the evidentiary materials pertinent to *the Sullivan-imposed condition upon Price's cause of action.* The *Sullivan* scrutiny must *precede any* assessment of state-law defenses. On remand, due consideration should be given to the requirements that *place on the plaintiff* the entire onus of showing that the defamatory communication lies outside the zone of protection afforded by the U.S. Const. amend. 1.

#### B

The *Sullivan* rule—by whose standards the court would have us today assay Walters'

---

**16.** When necessary findings of fact and conclusions of law are absent, the case must be remanded with directions that they be made by the trial court. *Toxic Waste Impact Group, Inc. v. Leavitt,* Okl., 890 P.2d 906, 913 (1995); *Dyke v. St. Francis Hospital,* Okl., 861 P.2d 295, 300 n. 13 (1993); *Matter of Estate of Pope,* Okl., 808 P.2d 640, 642 (1990); *Robert L. Wheeler, Inc. v. Scott,* Okl., 777 P.2d 394, 399 (1989); *Teel v. Teel,* Okl., 766 P.2d 994, 999 n. 19 (1988); *American Ins. Ass'n v. Indus. Com'n,* Okl., 745 P.2d 737, 740 n. 15 (1987); *Sandpiper North Apartments v. Am. Nat. Bank,* Okl., 680 P.2d 983, 993 (1984); *Matter of Estate of Bartlett,* Okl., 680 P.2d 369, 377 (1984); *Davis v. Gwaltney,* Okl., 291 P.2d 820, 824 (1955).

**17.** For the pertinent terms of 12 O.S.1991 § 1443.1, see *supra* note.

**18.** The scope of the § 1443.1 privilege is narrower than that of the common law's fair report privilege. For the *distinctions* between the two privileges, see *Wright, supra* note at 987; for a history of the common law's fair report privilege, see *id.* at 985 n. 1. *See also* RESTATEMENT (SECOND) OF TORTS § 611.

**19.** *See* 12 O.S.1991 § 2008(C)(20), whose pertinent terms are:

"In pleading to a preceding pleading, a party shall set forth affirmatively:

\* \* \* \* \* \*

20. Any other matter of avoidance or affirmative defense."

*See also* RESTATEMENT (SECOND) OF TORTS § 580A comment e (1976).

**20.** *Sullivan* requires that a public person must prove that the defamatory "statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Sullivan, supra* note, 376 U.S. at 279–80, 84 S.Ct. at 725–26.

**21.** *Id.;* see also RESTATEMENT (SECOND) OF TORTS § 580A comments e and g.

**22.** *North v. Haskett,* 202 Okl. 146, 211 P.2d 279, 282 (1949). While *Haskett* predates the enactment of Oklahoma's most recent Pleading Code, its holding is still viable insofar as it addresses the proper allocation of probative responsibilities.

**23.** *Id.* at 282.

summary judgment—is *not* governed by state law but rather by federal constitutional jurisprudence which makes the rule's application a *pre-submission question of law solely for the trial judge.*[24]

The record amply demonstrates that the trial judge never made an examination of the evidentiary materials germane to a First Amendment analysis. His attention stood confined to Walters' affirmative defense based on the § 1443.1 privilege. He simply elected not to concern himself either (a) with the different *allocation of probative responsibility* when state-law affirmative defenses and federal constitutional protection against liability are to be considered or (b) with the evidentiary materials relevant to the federal-law questions raised by both Price and Walters.

## IV

### *FEDERAL* RIGHTS CANNOT BE DEFEATED BY STATE FORMS OF PROCEDURE IN PROCESSING CLAIMS OR DEFENSES

There is another reason why summary judgment cannot stand and the cause must be remanded for reconsideration of Walters' plea for summary relief. In a defamation action, in which both state-law defenses and federal impediments are interposed, it is improper to reach and resolve material state-law questions in total isolation from the tendered issues of controlling federal law. Not only do they impact on one another, but also, and more importantly, the former must not be allowed to impair, impede, abridge or burden the latter.[25] While under state law Price was doubtless entitled to a trial by jury on Walters' statutory privilege defense,

the latter's federal constitutional shields against liability—which trump state law—might have served to support summary relief to the defendants. State-law procedure cannot circumscribe or destroy federal rights. Isolated judicial examination into state-law defenses carries too high a risk of depreciating and diminishing the full legal effect of related or interconnected federal-law bars.[26] It is to be avoided as inherently unsafe.

## V

### SUMMARY

While Price's action against Walters does raise federal-law issues about constitutionally protected freedom of speech, that should be of *no concern* to us in this appeal. Before this court is a summary judgment based solely on a state-law question of statutory privilege. Tendered to us as the dispositive issue on appeal is Price's right to a jury trial under the *state* constitution. Had no conflicting inferences been affordable from the uncontroverted facts tendered by the record, privilege, as in *Crittendon,* would have indeed been a pure question of law. That is not the case here. Because a fact question does exist—whether Walters fairly and truly reported the bankruptcy proceedings—the case presents an issue for the jury.

Price was deprived (a) of his right to secure the trial judge's examination of the probative materials he tendered (and others countered) to establish that his claim was *actionable under the federal-law Sullivan standards,* (b) of the valuable opportunity to have that judicial scrutiny conducted free of the interfering effect of state-law defenses and (c) of a trial by jury on Walters' *state-law* defense of privilege. Because I view the

**24.** *See* RESTATEMENT (SECOND) OF TORTS § 580A comment g.

**25.** *Felder v. Casey*, 487 U.S. 131, 138, 108 S.Ct. 2302, 2306, 101 L.Ed.2d 123 (1988); *Monessen Southwestern Ry. Co. v. Morgan*, 486 U.S. 330, 335–36, 108 S.Ct. 1837, 1842–43, 100 L.Ed.2d 349 (1988); *Burks v. Lasker*, 441 U.S. 471, 479, 99 S.Ct. 1831, 1838, 60 L.Ed.2d 404 (1979);

*Brown v. Western R. Co. of Alabama*, 338 U.S. 294, 296, 70 S.Ct. 105, 106, 94 L.Ed. 100 (1949).

**26.** For an in-depth exploration of the problems created by intermixture of federal with state rights, see Althouse, *How To Build A Separate Sphere: Federal Courts And State Power*, 100 HARV. L. REV. 1485, 1533 (1987).

summary-adjudication process as seriously flawed, I would reverse the nisi prius judgment and remand the cause for reconsideration of the entire probative materials' content in strict conformity to the principles set forth in my dissent.